UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| LOVELAND CITY SCHOOL DISTRICT BOARD OF EDUCATION, | Civil Action No. C-1-02-202 |
| | (Weber, J.) |
| Petitioner/Appellant, | |
| v. | **PETITIONER'S SUPPLEMENTAL BRIEF** |
| SUSAN DUDLEY, individually and as the parent and natural guardian of Andrew Hembree, | |
| Respondent/Appellee. | |

## INTRODUCTION

In this Individuals with Disabilities Education Act (IDEA) action, Petitioner, the Loveland City School District Board of Education (Loveland), is appealing the decision of a State Level Review Officer appointed by the Ohio Department of Education which held that the Individualized Education Plan (IEP) which Loveland proposed to provide Andrew Hembree, a resident of the Loveland City School District, who has been identified as a child with a disability within the meaning of the IDEA, would not have provided Andrew a free, appropriate public education. At the time Loveland prepared and proposed the IEP for Andrew which is the subject of this appeal, Andrew was attending The Trinity School, a private school in Cincinnati, Ohio. The IEP which Loveland proposed to provide for Andrew was for the 2001-2002 school year. Andrew's mother rejected Loveland's proposed IEP, and Andrew remained at Trinity for the 2001-2002 school year. The consequence of the SLRO's decision is that, if it is affirmed, Loveland would be required

to pay Andrew's tuition at Trinity for the 2001-2002 school year, and for a part of the 2000-2001 school year.

Andrew returned to Loveland at the start of the 2002-2003 school year, which was Andrew's eighty grade year. Andrew is now a freshman in high school attending Loveland High School.

The parties have already filed briefs in this action, and presented oral arguments to the court, and were prepared, and agreed, to have the court decide Loveland's appeal on the basis of the administrative record. However, subsequent to oral argument, additional evidence was submitted, including Andrew's IEP for the 2002-2003 school year by Andrew's mother, and by Loveland, Affidavits from members of Loveland's staff regarding the 2002-2003 IEP and Andrew's performance and behavior while attending Loveland.[1] After the submission of the additional evidence, the court scheduled an evidentiary hearing, presumably for the purpose of providing the parties the opportunity to present their additional evidence in a more efficient and effective manner: through the examination and cross-examination of witnesses. That hearing has now been held, at which both Loveland and Mrs. Dudley, Andrew's mother, presented their additional evidence through the testimony of witnesses and submission of documents. The purpose of this supplemental brief is to review and discuss the relevancy of the additional evidence, and address the burden of proof question posed by the Court.

---

[1] 20 U.S.C. Section 1415(i)(2) provides that the court, in an appeal such as this, may hear additional evidence at the request of a party.

2

## **DISCUSSION**

**The Additional Evidence**

Loveland has repeatedly stated in its initial brief, at oral argument, in its response to Andrew's mother's motion to present additional evidence, and throughout these proceedings, that the issue in this action is whether the IEP which it proposed to provide Andrew (Exhibit 8 in the administrative record) was designed to provide Andrew an educational benefit. Stated differently, if Andrew had attended Loveland for the 2001-2002 school year, was it more likely than not that Andrew <u>could</u> have made academic progress and <u>could</u> have made progress ameliorating his behavior issues as a result of the implementation of the IEP which Loveland was proposing to provide Andrew. That is what the court must decide in this case. Given the issue, it can be argued that the additional evidence which has been presented, dealing as it does with Andrew's IEP for the 2002-2003 school year and his performance and conduct during the 2002-2003 school year, is irrelevant. Loveland would not seriously dispute this argument because Loveland firmly believes that the evidence in the administrative record and the content of its proposed IEP for Andrew requires the conclusion that its proposed IEP for Andrew was designed to provide Andrew an educational benefit.

But the additional evidence is interesting, and perhaps relevant, for two reasons. First, it helps to explain why Loveland is so firmly convinced that its proposed IEP for Andrew was appropriate for Andrew. Secondly, the additional evidence certainly raises questions about the validity of the SLRO's reasons for finding that the IEP which Loveland

3

proposed to provide Andrew is not appropriate for Andrew, i.e. that Andrew would not receive any educational benefit from Loveland's proposed IEP.

The State Level Review Officer found that Loveland's proposed IEP for Andrew was inappropriate for Andrew because it did not contain a separate behavior plan; because it did not provide for direct speech therapy to address Andrew's social skills deficits; because it did not provide Andrew direct occupational therapy to address his handwriting deficits; and because Loveland's proposed IEP for Andrew would have placed Andrew a part of the school day in regular education classes where, according to the SLRO, Andrew could not be successfully educated. Loveland addressed, and refuted, these findings in its initial brief, and the additional evidence also refutes the SLRO's findings.

With respect to a separate behavior plan for Andrew, Loveland did not, as previously discussed, include a separate behavior plan in its proposed IEP for Andrew. At the insistence of Andrew's mother, Loveland did include a behavior plan with Andrew's 2002-2003 IEP. However, the behavior plan which Loveland included with Andrew's 2002-2003 IEP is not a separate behavior plan. It simply restates services already identified to be provided to Andrew in the IEP itself. More importantly, and significantly, the behavior plan attached to Andrew's 2002–2003 IEP restates services which were to be provided Andrew pursuant to the IEP which Loveland proposed to provide Andrew for the 2001-2002 school year, the IEP which is at issue in this case. Thus, the additional evidence establishes that

Loveland's proposed IEP for Andrew had embedded in it a behavior plan appropriately addressing Andrew's possible or potential behavior issues.[2]

Further with respect to a behavior plan for Andrew, the administrative record shows that Loveland did not include a behavior plan in its proposed IEP for Andrew because it did not believe Andrew's behaviors were sufficiently disruptive to require a separate behavior plan. The additional evidence, by way of the testimony of those Loveland staff members responsible for addressing Andrew's potential inappropriate behaviors, Katherine Lawless, Joseph Rutkowski, and Erica Kramer, establish that Loveland was correct in this regard. Their testimony establishes, and Andrew's mother does not dispute, that Andrew presented no behavior concerns during the 2002-2003 school year, including from the very start of the 2002-2003 school year.

With respect to direct speech therapy for Andrew to address his social skills deficits, Andrew's 2002-2003 IEP does provide for direct speech therapy for Andrew to purportedly improve Andrew's expressive language skills. Again, Loveland agreed to provide speech therapy to Andrew during the 2002-2003 school year at the at the insistence of Andrew's mother. However, the annual goal and short-term objectives on Andrew's 2002-2003 IEP addressing Andrew's expressive language skills (Annual Goal No. 6 and Objectives 6(a) and 6B on p. 7 of 11 of Andrew's 2002-2003 IEP) are essentially only a restatement and

---

[2] There is a question in this case as to when the inclusion of a behavior plan in Andrew's IEP became an issue. As noted in Loveland's initial brief, Loveland's witnesses testified that Andrew's mother did not request a separate behavior plan during the course of developing Andrew's proposed IEP for the 2001-2002 school year. Andrew's mother testified the opposite. Given the manner in which a behavior plan for Andrew was handled in connection with his 2002-2003 IEP, which could easily have been done in connection with Andrew's proposed 2001-2002 IEP, one can only wonder whether the lack of a separate behavior plan for Andrew's 2001-2002 IEP only became an issue for Andrew's mother at, and for the purposes of, the due process hearing.

5

paraphrasing of Annual Goal No. 5 and Objectives 5(c), (d), (e) and (f) of Andrew's 2002-2003 IEP. Moreover, and again more importantly, these same objectives are included in Loveland's proposed IEP for Andrew. (See Objectives 5(c), (d), (e) (f) and (g) on p. 4 of 8 of Exhibit 8). Thus, what the additional evidence shows is that Andrew did not need speech therapy to address his social skills deficits, as found by the SLRO, because he has exhibited no significant social skills deficits since attending Loveland schools, but if he had Loveland's proposed IEP for Andrew appropriately addressed such deficits.

The most erroneous finding of the SLRO is that Loveland's proposed IEP for Andrew was inappropriate because it placed Andrew in regular education classes for at least a part of the day, and this is the finding which is most refuted by the additional evidence. Andrew's 2002-2003 IEP initially provided for Andrew to take one course, social studies, in a regular education class. However, within a week of the start of the 2002-2003 school year Andrew's IEP was amended, at the request of Andrew's mother, to provide that Andrew would also take both science and math in regular education classes. In other words, within a week of the start of the 2002-2003 school year Andrew was taking all but one course (language arts) in regular education classes. Furthermore, as already discussed, the additional evidence establishes that Andrew received passing grades, and was not a behavior problem, in the courses he took in regular education classes. Accordingly, not only is the SLRO's finding that Andrew's proposed IEP was inappropriate for Andrew because it placed him in regular education classes erroneous as a matter of law in view of the IDEA's mandate that children with disabilities be educated to the maximum extent possible with non-disabled students, this finding of the SLRO cannot be

reconciled in any way with Andrew's performance and conduct in the regular education classes in which he was placed when he returned to Loveland.

What the additional evidence shows is that the special education program which Loveland provided to Andrew during the 2002-2003 school year was essentially the same special education program which it was proposing to, and prepared to, provide Andrew during the 2001-2002 school year. Loveland will not argue that the fact that the 2002-2003 school year was a successful school year for Andrew means that the 2001-2002 school year would have been just as successful for Andrew if he had attended Loveland schools. Andrew did not attend Loveland during the 2001-2002 school year, so that cannot be argued. However, it can certainly be argued that Andrew's success during the 2002-2003 school year under an IEP that is essentially the same as the IEP that Loveland was proposing to provide Andrew for the 2001-2002 school year is probative evidence that the IEP which Loveland proposed to provide Andrew for the 2001-2002 school year was designed to provide Andrew a meaningful educational benefit. At the least, Andrew's success during the 2002-2003 school year all but nullifys the SLRO's reasons for finding that Andrew would not have derived any meaningful educational benefit from Loveland's proposed IEP.[3]

Loveland anticipates that Andrew's mother will argue that it was the additional year Andrew spent at Trinity, and the services he received at Trinity during that year, that enabled him to make such an easy and successful transition back to Loveland schools in

---

[3] The SLRO, in finding that Loveland's proposed IEP for Andrew would not have provided Andrew an appropriate education was, in effect, finding that Andrew would not have derived any meaningful educational benefit from Loveland's proposed IEP.

the eighth grade. It is also anticipated that Andrew's mother will argue that it was the services that she insisted be included in Andrew's 2002-2003 IEP which enabled Andrew to have a successful eighth grade year at Loveland. There are several problems with these arguments. First, Andrew's mother did not present any evidence at the evidentiary hearing which would support the contention that Trinity worked a miracle with Andrew during the 2001-2002 school year.[4] If anything, according to the testimony of Margaret Ballard, Andrew's teacher at Trinity, Andrew received less individual attention during the 2001-2002 school year than he received in other school years at Trinity. Another problem with these contentions is that within a week of the start of the 2002-2003 school year Andrew's mother was requesting that Andrew be placed in regular education classes for all but one of his subjects. While Loveland believes its staff is very competent, it seriously doubts that within one week they could have transformed Andrew from a student who could not be placed in a regular education class for even a small part of his school day into a student who could be placed in regular education classes for virtually all of his school day without any concerns regarding his behavior. The point is, to the extent that it is relevant, the additional evidence indicates that Loveland was right, and Andrew's mother, the staff at Trinity, and the IHO and SLRO were wrong in assessing Andrew's ability to successfully attend Loveland schools.

---

[4] It must be kept in mind that the IHO and the SLRO both found that prior to the start of the 2001-2002 school year Andrew's behavior was so bad that he could not be placed in a regular education classroom for even a small part of his school day.

**BURDEN OF PROOF**

At the conclusion of the evidentiary hearing, the court directed the parties to address in their supplemental briefs the question of which party has the burden of proof in an IDEA due process proceeding. Loveland assumes that the court wants the burden of proof question to be addressed because in their respective Findings of Fact and Conclusions of Law submitted to the court, Loveland stated as a Conclusion of Law that Andrew's mother had the burden of proof in the impartial due process hearing because she initiated the hearing, while Andrew's mother disagreed with this Conclusion of Law. Additionally, neither the Impartial Hearing Officer or the SLRO, in their respective decisions, addressed the question of which party has the burden of proof, even though Loveland raised it in its briefs to the IHO and SLRO. The fact is, there is no dispute as to which party has the burden of proof in an IDEA impartial due process proceeding. The Sixth Circuit has consistently held that "...the party challenging the terms of an IEP should bear the burden of proving that the educational placement established by the IEP is not appropriate." *Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990); See also *Doe by and through Doe v. Board of Educ. of Tullahoma City Schools*, 9 F.3d 455, 458 (6th Cir. 1993); *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990). Andrew's mother is the party challenging the appropriateness of the IEP which Loveland proposed to provide Andrew. Therefore, per the Sixth Circuit cases cited above, Andrew's mother has the burden of proof of establishing that the proposed IEP is not appropriate. Applying the Supreme Court's pronouncement in *Rowley* that an IEP is appropriate if it is designed to provide a

child with a disability an educational benefit,[5] this means that Andrew's mother has the burden in this proceeding of establishing by a preponderance of the evidence that it is more likely than not that Andrew would not have received an educational benefit from the IEP which Loveland proposed to provide Andrew.

In any discussion regarding whether Andrew's mother has met her burden of proof, it should first be pointed out that there is no dispute that Loveland complied with all of the IDEA's procedural requirements in developing the IEP which it proposed to provide Andrew. Full compliance with the IDEA's procedural requirements creates virtually a presumption of the appropriateness of the IEP developed through such full compliance with the procedural regulations. In this regard, the Sixth Circuit has held:

> We think that the Congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content of an IEP. *Doe v. Defendant I*, *supra* at 1190-91.

What the Sixth Circuit is saying in the above quote from *Defendant I* is that it is more likely than not that an IEP will be appropriate if it is developed in compliance with the IDEA's procedures. Given Loveland's compliance with the IDEA's procedural requirements in developing the IEP it proposed to provide Andrew, Andrew's mother's burden of proof in this case is, therefore, substantially greater than it would have been had Loveland not complied with the IDEA's procedural requirements.

---

[5]*Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 202-201 (1982).

In order to meet her burden of proof in this case it is not enough for Andrew's mother to simply state that Andrew has behavior problems and he needed a separate behavior plan. What Andrew's mother must demonstrate is how the lack of a separate behavior plan would have prevented Andrew from deriving an educational benefit from the IEP Loveland proposed to provide Andrew. To be even more specific, Andrew's mother must establish by a preponderance of the evidence that even though Andrew's proposed IEP contained an annual goal and objectives directed at Andrew's purported behavior problems, and even though the proposed IEP specified a number of services to be provided to Andrew addressing these behavior problems, Andrew still would not receive an educational benefit from the proposed IEP because it did not contain a separate behavior plan. Stated even differently, why did Andrew need a separate behavior plan in order to receive an educational benefit from the IEP Loveland proposed to provide Andrew since the proposed IEP had embedded in it goals, objectives and services addressing Andrew's potential behavior issues?

The burden of proof imposed on Andrew's mother by the Sixth Circuit and Loveland's compliance with the IDEA's procedural requirements further required Andrew's mother to establish why Andrew would not receive an educational benefit from the proposed IEP if he did not have his social skills deficits addressed by 30 minutes of direct speech therapy, rather than by the specialized social skills instruction specified in the proposed IEP. (P. 5 of 8 of Exhibit 8). Stated differently, Andrew's mother must establish that even though Andrew was to receive specialized instruction in social skills under the proposed IEP, and assistance in working on the social skills objectives listed in connection with Goal No. 5 on the proposed IEP (Exhibit 8, p. 4 of 8), he would still not receive any

educational benefit from the proposed IEP if he did not receive 30 minutes per week of direct speech therapy to improve his social skills.

Andrew's mother's burden of proof with respect to Andrew's placement in regular education classes is even greater still because she must overcome the IDEA's requirement that children with disabilities be educated to the maximum extent possible with non-disabled peers. Does the evidence in this case portray a child who is so behaviorally challenged, who is so disruptive, who is so out of control, that he cannot be educated for even a brief period of time with his non-disabled peers? How do you improve your social skills deficits if you do not have the opportunity to interact with other students your own age? Simply put, there is no way the evidence in this case can be viewed as establishing that it is more likely than not that Andrew could not derive any benefit from being educated, at least part of his school day, with non-disabled students.[6]

At the administrative level of an IDEA case the burden of proof standard enunciated by the Sixth Circuit is rarely correctly applied, just as the Chevrolet versus Cadillac educational plan standard enunciated by the Sixth Circuit in *Tullahoma, supra,* is rarely correctly applied. This is the reality of IDEA cases because the sympathies in these cases almost invariably lie with the parents of the child with the disability. Loveland understands why IHO's and SLRO's, and even courts, are sympathetic to the parents but understanding why and accepting why are two different things. The IDEA is probably as

_____

[6] Loveland has not addressed Andrew's mother's burden of proof with respect to Andrew's need for direct occupational therapy because Loveland believes it gainsays the intelligence of this court to argue to this court that the IEP Loveland proposed to provide Andrew, with all of the services and accommodations it would have provided Andrew, was not designed to provide Andrew an educational benefit because it did not include 30 minutes of direct occupational therapy a week to assist Andrew with improving his handwriting skills.

12

unfunded, or underfunded, a mandate as Congress has passed in recent years. When a public school district, like Loveland, does its best to comply with all the procedural requirements of the IDEA, and does in fact comply with all the procedural requirements of the IDEA in developing an IEP, it is entitled to have the burden of proof standard and other relevant judicial interpretations of the IDEA correctly applied to a dispute over the appropriateness of that IEP. In the case at bar, Loveland complied with all the procedural requirements of the IDEA and developed an IEP for Andrew which undisputedly addresses all of Andrew's special education needs. To assist Andrew in reaching the goals and objectives described in his IEP, Loveland proposed to provide Andrew a number of services (but not all of the services which Andrew's mother wanted) and accommodations which would be implemented by trained, competent and caring professionals. Has Andrew's mother met her burden of proof and established by a preponderance of the evidence that it is more likely than not that Andrew would not have derived any meaningful educational benefit from the IEP which Loveland proposed to provide Andrew? Loveland is confident that the court, regardless of where its sympathies lie in this case, knows in its judicial heart that that question must be answered in the negative.

Before concluding, Loveland feels constrained to make one further point regarding the sympathies that the parents of a child with a disability engender in IDEA cases. At the close of the evidentiary hearing, the court went to some lengths to praise Andrew's mother for all that she had done for Andrew, for turning a child who, as described by Andrew's mother, was out of control and uneducable in the third grade, into a successful student in the eighth grade. Loveland likewise applauds Andrew's mother's efforts and advocacy on behalf of Andrew, and she should be rightly commended for her role in Andrew's current

13

academic and athletic successes. However, Loveland does not at all agree with Andrew's mother's description of Andrew's conduct and academic performance while Andrew was enrolled in Loveland schools from kindergarten to the third grade.

Loveland conducted a multifactored evaluation of Andrew in the spring of 1998, when he was in the third grade. (Exhibit 2 in the Administrative Record). As a result of the multifactored evaluation, it was concluded that Andrew did not qualify as a child with a disability, primarily because his academic performance to that time was consistent with his cognitive abilities, and because his behavior was similar to the behavior of other third graders. Andrew's mother was represented throughout the 1998 MFE process by an experienced special education advocate, yet at no time even remotely contemporaneous with the completion of the 1998 multifactored evaluation did Andrew's mother dispute the results of the 1998 multifactored evaluation. As a result of the 1998 MFE, Loveland determined that Andrew qualified as a child with a handicap within the meaning of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. Sections 705 et seq.), and Loveland was prepared to develop and provide for Andrew what is known as a Section 504 educational plan. Loveland did not have the opportunity to do so because Andrew's mother withdrew Andrew from Loveland schools and enrolled him at Trinity.[7]

Loveland did not present testimony from Andrew's third grade teacher or principal to rebut the testimony of Andrew's mother regarding his third grade year for the reason that Loveland did not consider Andrew's performance in the third grade to be relevant to

---

[7] Since Loveland has no way of doing so, it does not dispute the description of Andrew's behavior at the start of, and during, the fourth grade at Trinity. However, it just may be that Andrew's behavior in his first year at Trinity was so bad because Andrew did not want to be at Trinity.

14

whether the IEP which Loveland was proposing to provide Andrew for the seventh grade would have provided Andrew an appropriate education. In hindsight, that was probably a mistake because it is relatively clear from Impartial Hearing Officer Favret's decision that he believed Loveland should have identified Andrew as a child with a disability when Andrew was in the third grade, and it is certainly possible that that belief played a part in his decision, which was simply rubber stamped by the SLRO, that the IEP which Loveland proposed to provide Andrew for the seventh grade was inappropriate. The point is, while Andrew's mother should be commended for her efforts on behalf of Andrew, her testimony regarding Andrew's performance and conduct at Loveland schools before she enrolled him at Trinity are not supported by the administrative record, are not relevant to the issue of whether the IEP which Loveland proposed to provide Andrew in the seventh grade was appropriate for Andrew, and should not be considered in deciding whether Loveland's proposed IEP for Andrew in the seventh grade was appropriate for Andrew.

## CONCLUSIONS

Loveland complied with all of the procedural requirements of the IDEA when it conducted a multifactored evaluation of Andrew during the 2000-2001 school year and when it developed an individualized education plan for Andrew for the 2001-2002 school year. The IEP which Loveland developed for Andrew meets all of the procedural requirements of the IDEA. It contains annual goals and objectives which undisputedly address Andrew's special education needs. It provides for services and accommodations addressing Andrew's special education needs. It would have been implemented by trained and competent staff. The additional evidence which has been presented only supports Loveland's assessment of Andrew and the appropriateness of the IEP which Loveland

15

proposed to provide Andrew. Loveland has stated in its initial brief and at oral argument, and it will state again, that if the requirements of the IDEA as interpreted by the United States Supreme Court in *Rowley*, and as interpreted by the Sixth Circuit in *Tullahoma* and the other cases cited in Loveland's brief, are objectively and correctly applied to the evidence in the administrative record it must be concluded that the IEP which Loveland proposed to provide Andrew was appropriate for Andrew, i.e. was designed to provide Andrew a meaningful educational benefit. Accordingly, Loveland submits that the court should reverse the SLRO's decision and find that Loveland did offer to provide Andrew's Hembree a free, appropriate public education through the IEP it proposed to provide Andrew for the 2001-2202 school year.

Respectfully submitted,

*[signature]*

J. Michael Fischer        (0009179)
ENNIS, ROBERTS & FISCHER
121 West Ninth Street
Cincinnati, Ohio 45202
(513) 421-2540
(513) 562-4986-fax
jmfischer@erflegal.com
Attorney for Plaintiff/Petitioner

16

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served upon **Phyllis E. Brown, Esq.,** 119 E. Court Street, Suite 510, Cincinnati, Ohio 45202-1203 by ordinary U.S. Mail on this 3rd day of Oct., 2003.

J. Michael Fischer