* FILED
KENNETH J. MURPHY
CLERK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

03 OCT -6 PM 3: 39

... COURT
S... DIST OHIO
WEST DIV CINCINNATI

| | | |
|---|---|---|
| **LOVELAND CITY SCHOOL** | : | **Case No. C-1-02-202** |
| **DISTRICT BOARD OF EDUCATION,** | : | **Judge Weber** |
| | : | |
| **Plaintiff/Petitioner,** | : | **RESPONDENT'S POST-EVIDENTIARY** |
| | : | **HEARING BRIEF ON BEHALF OF** |
| **v.** | : | **AH** |
| | : | |
| **SUSAN DUDLEY, Individually and as** | : | |
| **the parent and natural guardian of** | : | |
| **AH,** | : | |
| | : | |
| **Defendant/Respondent.** | : | |

## I.    INTRODUCTION

Loveland argues that its 2003 Individualized Education Program ("IEP") is "virtually identical" to its 2001 IEP, at issue in this case. Therefore, Loveland suggests, Andrew's progress under the 2003 IEP proves that its 2001 IEP offered Andrew a free appropriate public education ("FAPE"). In May 2001, Andrew's parents, Susan and James Dudley, filed for due process, claiming that Loveland's 2001 IEP failed to provide Andrew with FAPE. Following a five-day evidentiary hearing and two post-hearing briefs from each party, Impartial Hearing Officer ("IHO") Favret found that Loveland's 2001 IEP failed to provide FAPE for Andrew. Loveland appealed the IHO's decision to a State Level Review Officer ("SLRO"). Both sides submitted additional briefs. SLRO Bohlen issued a decision, finding that Loveland's IEP failed to provide FAPE for Andrew. Loveland appealed the SLRO's decision to this Court.

Following briefing and oral argument in February 2003, the Court sought information regarding Andrew's then current eighth grade placement and, specifically, whether Andrew's 2003 IEP included a behavior plan. Counsel for Andrew's parents submitted a copy of his 2003 IEP for eighth grade, which included a behavior plan. Loveland submitted affidavits in which affiants - all employed by the Loveland School District - testified to Andrew's success in eighth grade, and to the "virtually identical" nature of Andrew's 2001 IEP for sixth grade (the IEP at issue) and his 2003 IEP for eighth grade. Loveland suggested that Andrew's success in eighth grade proved that Andrew would have been similarly successful in sixth grade and that Loveland's sixth grade IEP (the 2001 IEP) provided FAPE. Counsel for Andrew's parents objected to Loveland's submission of testimony not subject to cross-examination, and argued that Andrew's success in eighth grade was a tribute to Trinity's educational and behavioral program and its work with Andrew during his four years there from fourth through seventh grades. This Court scheduled a one-day evidentiary hearing for testimony as to Andrew's 2002-03 school term (eighth grade), followed by post-hearing briefs.

## II.    WHICH PARTY BEARS THE BURDEN OF PROOF?

The answer to this question must be determined within the context of the standard of review in IDEA cases. The Sixth Circuit applies a "modified" *de novo* standard of review. *Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455,458 (6th Cir. 1993). The Sixth Circuit's "modified" *de novo* review requires a district court to give "due weight" to state administrative findings. Greater deference to administrative findings is due when educational expertise is relevant to those findings and the administrative decision is reasonable. *Burilovich v. Board of Education of Lincoln*

2

*Consolidated Schools,* 208 F.3d 560, 567 (6th Cir. 2000). The sole issue in this case is whether Loveland's 2001 IEP provided FAPE. This issue requires educational expertise, and thus greater deference is due to the administrative decision.[1]

The administrative decision to which the district court defers is the final decision of state authorities. *Id.*; *Renner v. Board of Education,* 185 F.3d 635, 641 (6th Cir. 1999); *Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir. 1990). Here, that is the decision of SLRO Bohlen. Within some circuits where both the original hearing officer and state review officer agree, as in this case, even greater deference is due to the administrative findings. *See, e.g., Combs v. School Board of Rockingham County,* 15 F.3d 357, 361 (4th Cir. 1994).

Within the context of the standard of review arises the issue of which party bears the burden of proof. In the Sixth Circuit, a party challenging the terms of an IEP bears the burden of proving that the IEP is not appropriate. *Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir. 1990); *Cordrey v. Euckert,* 917 F.2d 1460, 1469 (6th Cir. 1990). This suggests that at the administrative level, because the Dudleys challenged Andrew's IEP, the burden should have rested with them to prove that the IEP was not appropriate. IHO Favret stated that Loveland bore the burden of demonstrating the appropriateness of its proposed IEP. Decision by Impartial Hearing Officer at 19, Certification of Record No. 8. At no other point in his decision in favor of the Dudleys does IHO Favret discuss the burden of proof. Nor does he indicate that where he deemed the burden of proof to

---

[1]    This is further discussed in Respondent's Brief filed with this Court on November 14, 2002 at 4-6.

3

rest had any bearing on his decision.  IHO Favret's decision on the 2001 IEP is strongly in favor of the

Dudleys.  Among IHO Favret's factual findings regarding the 2001 IEP are the following:

- It is not reasonable to prepare an IEP for an SED student without at least some kind of behavior plan in place.  *Id.* at 21.

- Andrew's handwriting is horrible.  *Id.*

- Andrew needs specialized social skills instruction and the IEP did not provide it.  No anger management class or service existed in Loveland for sixth grade students; no social skills group existed or was set out as a specific IEP service for Andrew.  *Id.* at 23.

- The nature and severity of Andrew's ADHD, his social skills deficits and the amount of related services he would need in a regular education class outweigh the benefits.  *Id.* at 25-26.

In its Appeal from the Final Decision of IHO Favret, Loveland set out eight issues of appeal.

These did <u>not</u> include the issue of where IHO Favret rested the burden of proof.  Loveland Appeal,

Certification of Record No. 9.   In its brief to SLRO Bohlen, Loveland discussed the issue of burden of

proof - but only in relation to the Dudley's appeal of Loveland's violation of IDEA's child-find

provisions and its failure to identify Andrew in its 1998 MFE.  Neither are issues in this Court.

Loveland School District Brief on Appeal at 10, Certification of Record No. 14.  In the portion of its

brief objecting to the IHO's Findings and Conclusions regarding Loveland's 2001 IEP for Andrew,

Loveland never raises the issue of the burden of proof or even discusses its relevance.  *Id.* at 11-30.

Nor does SLRO Bohlen discuss which party bears the burden of proof in her decision in favor of the

Dudleys.  SLRO Decision, Certification of Record No. 17.  Rather, SLRO Bohlen reviewed the entire

record and made an independent decision upon completion of her review that IHO Favret's Findings of

Fact were thorough and careful, and  supported by sufficient evidence.  *Id.* at 2, 10.  She reviewed the

transcript of the hearing and found the IHO's summaries of testimony to be thorough and careful,
following that review. *Id.* at 2, 10.

The issue now arises as to which party bears the burden of proof before this Court. As noted
above, Sixth Circuit precedent provides that the party challenging the terms of an IEP bears the burden
of proving that the educational placement established by the IEP is not appropriate. *Doe v. Defendant
I,* 898 F.2d 1186, 1191 (6th Cir. 1990); *Cordrey v. Euckert,* 917 F.2d 1460, 1469 (6th Cir. 1990);
and *Doe v. Board of Education of Tullahoma City Schools,* 9 F.3d 455, 458 (6th Cir. 1993).
Indeed, at its September 5, 2003 evidentiary hearing, this Court referred counsel specifically to these
Sixth Circuit holdings.

In each of the above-cited cases, the parents, as plaintiffs, filed suit in district court to reverse a
final administrative decision by a SLRO in favor of the school district. In each case, the parents
challenged the terms of an IEP. Under these circumstances, the Sixth Circuit found that the parents, as
plaintiffs, bore the burden of proving that the IEP was inappropriate. In *Doe v. Defendant I,* the
child's parents appealed an administrative finding that the IEP was appropriate. The parents had
accepted the IEP as valid and adequate, but later refused to allow their son to take advantage of its
services. The parents then attempted to use his failing grades to establish a lack of services. *Doe v.
Defendant I,* 898 F.2d at 1188. In *Cordrey,* the parents, as plaintiffs in district court, appealed the
SLRO's decision in favor of the school district regarding the need for summer services. The district
court rested the burden of proof on the parents, finding that the party challenging the IEP bore the
burden of proving the educational placement under the IEP was not appropriate. *Cordrey,* 917 F.2d
at 1469. In *Doe v. Tullahoma City Schools,* the parents again were the plaintiffs, appealing from an

5

administrative decision finding the IEP appropriate.  In each of these cases, the parents--as plaintiffs in

the district court-- challenged the terms of an IEP that the SLRO had found appropriate.

  The Sixth Circuit found that the burden of proof in these cases rested with the parents because

they were plaintiffs challenging the IEP terms.  In *Dong v. Board of Education of Rochester*

*Community Schools,* the Sixth Circuit reiterated that the party challenging the terms of an IEP should

bear the burden of proving that the IEP placement was not appropriate.  *Dong,* 197 F.3d 793 (6th Cir.

1999).  In *Dong*, the parents brought the action challenging the decision of the SLRO in favor of the

school district.  The *Dong* court cites with approval *Clyde K. v. Puyallup School District No. 3,* 35

F.3d 1396, 1398-99 (9th Cir. 1994), in which the Ninth Circuit adopted the general administrative

principle that the party challenging an agency's decision bears the burden of proof.  *Dong*, 197 F.3d at

799.  This was the same language used by the Sixth Circuit in *Doe v. Defendant I and Cordrey.  Doe*

*v. Defendant I*, 898 F.2d at 1191; *Cordrey,* 917 F.2d at 1466.

  Contrast this with an appeal to a district court by a school district as the party seeking to

overturn the decision of the SLRO.  Under these circumstances, the burden of proof must rest with the

school district as the party challenging the agency decision.  In *Elida Local School District v.*

*Erickson,* a school district challenged an administrative decision holding that a student continued to be

entitled to special education services.  The Ohio district court found that as the party challenging the

ruling of the administrative review officer, the school district bore the burden of proof.  *Elida Local*

*School District,* 252 F.Supp. 2d 476, 490 (N.D. Ohio 2003).  The district court reasoned that the

administrative finding in an IDEA case "may be set aside only if the evidence before the court is more

likely than not to preclude the administrative decision from being justified based on the agency's

presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Id.* at 490,

citing *Burilovich v. Board of Education of Lincoln Consolidated Schools*, 208 F.3d 560, 567 (6th

Cir. 2000). Under this standard of review, the party challenging the administrative decision bore the

burden of proof.

The Sixth Circuit took the same position in *McLaughlin v. Holt Public Schools Board of

Education*, 320 F.3d 663 (6th Cir. 2003). Here, the parents filed an action in district court seeking

reversal of a SLRO decision in favor of the school district. The parents appealed to district court. As

plaintiffs, the parents bore the burden of proof. The district court found in favor of the parents,

reversing the SLRO. The school district appealed to the Sixth Circuit. The Sixth Circuit reversed,

finding that the district court had improperly shifted the burden of proof from the plaintiffs (parents) to

the defendant (school district). *Id.* at 672   In doing so, the district court had failed to give due weight

to the administrative decision, which involved educational expertise. *Id.* at 673. And, the Sixth Circuit

concluded, when appropriate deference was given to the administrative decision, the plaintiffs (parents)

failed to meet their burden of proof. *Id.* In *McLaughlin*, the Sixth Circuit connects the issue of the

burden of proof to the standard of review. The party filing the action in district court to appeal  the

administrative holding bears the burden of proof. This is because  the "modified" *de novo* standard of

review  requires deference to the administrative holding.

Judge Rice set out this concept more fully in *Board of Centerville City School District v.

Board of Education of the State of Ohio and Goldman*, 1993 WL1318610 (S.D. Ohio), attached

hereto at Tab A. Here, as in our case, the school district (plaintiff) appealed a decision of the SLRO

that the school district's placement of the child was inappropriate. The district court rested the burden

of proof on the school district (plaintiff), as the party challenging the SLRO's decision. *Id.* at *18. In footnote 17, Judge Rice refers to the Sixth Circuit holdings in *Cordrey,* and *Doe v. Defendant I,* distinguishing them from the case at bar. In both of those cases, the parents - not the school district - were the plaintiffs and challenged the administrative findings. *Id.* In *Cordrey* and *Doe v. Defendant I,* the parents - as the party challenging the IEP - bore the burden at the original hearing, And, in district court, the parents again bore the burden as the party challenging the final decision of the state agency. *Id.* Judge Rice observed that these Sixth Circuit decisions did not address the issue of which party should bear the burden of proof when the parents prevailed at the final administrative level and it was the school district appealing to district court. For the burden to remain with the parents would be unjust: the parents would <u>always</u> bear the burden in district court, whether as plaintiffs (party challenging state administrative decision) or as defendants (prevailing party in state administrative decision). Rather, the burden of proof in district court must rest on the party challenging the final decision of the state administrative agency. Only this allocation complies with the United States Supreme Court directive to give "due weight" to final administrative level proceedings. *Id.* See also, *Burlington v. Department of Education of Massachusetts,* 736 F.2d 773, 794 (1st Cir. 1984), *aff'd,* 471 U.S. 359 (1985); *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1988); *Barnett v. Fairfax County School Board,* 927 F.2d 146, 152 (4th Cir.), *cert. denied* 502 U.S. 859 (1991); *Clyde K. v. Puyallup School District No. 3,* 35 F.3d 1396, 1399 (9th Cir. 1994).

In our case, the burden of proof in this Court rests with Loveland. Loveland is the plaintiff in this action, challenging the SLRO's decision. Under federal law, upon the final decision by the highest state level in favor of the parent that a change in placement is appropriate, then that new placement

become the child's "currrent" placement.[2]  34 C.F.R. §300.514.  Ohio law follows federal law and

deems the SLRO's placement to be the child's "current" placement.  See, Ohio Administrative Code

3301-51-08 (J)(4), (J)(1), attached hereto at Tab B.  Upon SLRO Bohlen's decision, Trinity became

Andrew's current educational placement and Loveland was required to and began to pay Andrew's

tuition at Trinity.  Thus, under federal and Ohio law, Andrew's current placement at the time of

Loveland's filing in this Court was Trinity.  Loveland, as plaintiff, filed this action challenging Andrew's

current placement at Trinity, and bears the burden of proof in this Court.


## III.    FACTS

On September 5, 2003, this Court heard  testimony regarding Andrew's eighth grade term

(2002-03) at Loveland.  Loveland's witnesses were Catherine Lawless, a supplemental service teacher

for the Loveland District; Erica Kramer, principal of Loveland Middle School; Joseph Rutkowski,

guidance counselor at Loveland Middle School; and Mary Ellen Wilson, Loveland's Director of Pupil

Services.

Ms. Lawless had  twice observed Andrew at Trinity in February 2002 (Andrew's seventh

grade school year).  Her observations were submitted as  Petitioner's Hearing Exhibit 1.  She reiterated

her written observations that Andrew appeared on task and followed directions.  Ms. Lawless had also

---

[2]      34 C.F.R. §300.514 states: "If the decision of a hearing officer in a due process hearing
conducted by the SEA [State Education Agency] or a state review official in an
administrative appeal agrees with the child's parents that a change of placement is
appropriate, that placement must be treated as an agreement between the state or local
agency and the parents for purposes of paragraph (a) [current educational placement]
of this section.

discussed Andrew with Margaret Ballard, his Trinity teacher. According to Ms. Lawless, Ms. Ballard expressed concerns regarding Andrew's difficulty with organization and writing down his homework assignments correctly; his tendency to talk out and act as "class clown;" his reading and handwriting difficulties; and his difficulties interacting positively with peers. Petitioner's Hearing Exhibit 1.

Pursuant to Andrew's IEP for 2002-03 (eighth grade), Ms. Lawless met with Andrew weekly for periods between twenty minutes and one hour. Ms. Lawless testified that Andrew was far less problematic than other children she counseled and needed her services far less. Ms. Lawless received concerns through Andrew's special education teacher regarding Andrew's failure accurately to write down homework assignments, his failure to complete homework, and his talking out in class–exactly the concerns expressed by Ms. Ballard. Andrew's teachers continued to have these concerns throughout Andrew's eighth grade term and set them out in May 2003 in Andrew's draft IEP for 2003-04. Respondent's Hearing Exhibit 2.

Under cross examination, Ms. Lawless testified that she never observed Andrew during his sixth grade school term (2001), the period at issue during the due process hearing. Two Loveland special education teachers had observed Andrew during February 2001, almost exactly one year before Ms. Lawless's observations of Andrew in seventh grade. Both teachers observed uncontrolled talking out, yelling, violent rocking, asking off task questions, and criticism of peers. One of the Loveland teachers documented eleven instances of talking out, ten instances of making noises and seven instances of yelling out – all within one class period. Respondent's Hearing Exhibit 1. Ms. Lawless acknowledged that these behaviors might require her services.

10

Ms. Kramer, principal at Loveland's Middle School, testified that Andrew's behavior during 2002-03 never required disciplinary action by her.  Under cross examination, Ms. Kramer testified that she had never observed Andrew in class and had no direct knowledge of his behavior during sixth grade, the school term at issue (2001), or seventh grade (2001-02), or even eighth grade (2002-03).

Mr. Rutkowski, Andrew's guidance counselor, testified to his responsibility under the 2002-03 IEP to provide daily access to Andrew for discussion of problems and to arrange for Andrew's participation in an anger management group.  Mr. Rutkowski testified that Andrew initiated contact with him several times per week for approximately twenty minutes to discuss problems.  Andrew never participated in the anger management group.  Mr. Rutkowski testified that Mrs. Dudley refused to sign a consent form for anger management services.  Petitioner's Hearing Exhibit 3.  Mrs. Dudley testified that she never received a consent form from him and only became aware of it upon the filing of  Mr. Rutkowski's affidavit in March 2003.  Mrs. Dudley immediately offered to sign it.  Both Mr. Rutkowski and Mrs. Dudley agree that Mr. Rutkowski told her that only one anger management class was available to Andrew, that it was held during Andrew's language arts class, and that Mrs. Dudley refused to pull Andrew out of an academic class in which he was struggling.  The result was that Loveland failed to provide the anger management services set out on Andrew's 2002-03 IEP.  Under cross examination, Mr. Rutkowski testified that he never observed Andrew at Trinity during 2001 (sixth grade) or 2001-02 (seventh grade), and had no direct knowledge of Andrew's behavior prior to his return to Loveland for eighth grade.

Ms. Wilson, Loveland's Director of Pupil Services, testified about the drafting of Andrew's IEP for 2002-03,  Petitioner's Hearing Exhibit 2.  Ms. Wilson stated that the Behavior Intervention Plan

and direct speech therapy services were included at the request of Andrew's parents. Ms. Wilson

claimed that the Behavior Intervention Plan simply repeated services set out on Andrew's IEP. She

claimed that the services in his IEP for 2002-03 (Petitioner's Hearing Exhibit 2) were "virtually the

same" as the services in the IEP at issue for 2001 (Petitioner's Hearing Exhibit 4).

Under cross examination, Ms. Wilson acknowledged that the services Andrew needed for an

appropriate education in 2002-03 had no bearing on what he needed two years earlier, in the 2000-01

school term. Ms. Wilson never observed Andrew at Trinity or at Loveland, and had no first-hand

knowledge of his behavior in a classroom either during 2001–the period at issue–or during his eighth

grade at Loveland. Ms. Wilson admitted that the 2001 IEP (Petitioner's Hearing Exhibit 4) at issue did

not include the following services found in the 2002-03 IEP (Petitioner's Hearing Exhibit 2): (1) daily

behavior rating by special education teacher; (2) use of a trained counselor to measure Andrew's

behavioral progress, collect data, and monitor implementation of his behavior plan; (3) daily access to

the guidance counselor to discuss social situations; (4) guarantee of pre-arranged weekly one-on-one

meetings with a behavioral management specialist; (5) participation in an anger management group; and

(6) daily access to a sensory diet for Andrew to use to regulate his behavior. At the time that

Andrew's IEP for 2001 was drafted, Ms. Wilson admitted that Loveland did not even have anger

management group services below the high school level. Nor did the 2001 IEP provide for direct

speech therapy to improve his pragmatic speech deficiency or direct occupational therapy for his

handwriting and to monitor his sensory diet. Both the direct speech therapy and direct occupational

therapy were included in the 2003 IEP.

Testifying on behalf of Andrew were David Braukman, who testified at the due process hearing as an expert witness on the needs of children with Attention Deficit Hyperactivity Disorder ("ADHD"); Margaret Ballard, Andrew's teacher at Trinity; and Mrs. Dudley, Andrew's mother.  Mr. Braukman updated his resume (Respondent's Hearing Exhibit 5) to include his current position as the Director of Academics at a community school in Cincinnati.  Mr. Braukman reiterated his qualifications to assess the educational needs of children with ADHD.  Mr. Braukman designed the curriculum at several universities for teaching teachers how to teach children with ADHD, is a master teacher of children with ADHD, and served as director of special education at Harmony Community School.  Mr. Braukman testified that Andrew's behavior problems stemmed from his severe ADHD and that the Emotionally Disturbed category for special education services was the appropriate category for severe ADHD children, like Andrew, when their behavior prevented learning.  No witness disputed his testimony.

Mr. Braukman observed Andrew at Trinity in April 2001, the Spring of sixth grade.  His observation was introduced as Respondent's Hearing Exhibit 6.  Mr. Braukman reinforced his testimony that in April 2001, Andrew could not have effectively participated in a regular classroom because of his disruptive behavior, his constant need for refocusing, his inability to interact appropriately with peers, and his talking out, including inappropriate comments.  Mr. Braukman testified that as of his observation in April 2001, regardless of modifications, the regular classroom setting would not be appropriate for Andrew.  Andrew needed a small class size, direct individual attention, constant redirecting, alternate seating, and a modified curriculum.  Mr. Braukman testified to his belief that eventually, with supports, Andrew could be returned to the regular classroom.  However, to participate in a regular classroom, Andrew needed first to get his ADHD under control.  Mr. Braukman testified

13

that it would take at least one additional year at Trinity following his April 2001 observation for Andrew to gain the needed skills.

Ms. Ballard taught Andrew at Trinity for fifth, sixth and seventh grades. Ms. Ballard was principal of Trinity when Andrew entered in the fourth grade. Ms. Ballard described Andrew's behavior in fourth grade (1998-99) as follows: he frequently fought with peers, roamed the classroom, and spoke out constantly, interrupting teachers and his peers; Andrew was seldom able to remain in class for a full period. During Andrew's fifth grade (1999-2000), Trinity adopted a school-wide behavior plan. Ms. Ballard testified that Andrew was the only child at Trinity unable to participate because his behaviors were so far from the norm that he had no chance of success. Trinity developed a separate behavior plan for Andrew that allowed for positive reinforcement. Ms. Ballard described Andrew's sixth grade (2000-01) as pivotal. Trinity began addressing Andrew's sensory issues, and using therapeutic music. Andrew continued to talk out in class and have fights, but with less frequency. It was during February of the sixth grade term that Loveland's two special education teachers observed Andrew. Ms. Ballard testified that during seventh grade, Andrew's final year at Trinity (2001-02), Andrew exercised greater self control and engaged in far fewer fights. Andrew showed more motivation and consistency in doing homework, and his grades substantially improved, though he remained on a modified curriculum. It was during February of the seventh grade term that Ms. Lawless observed Andrew. Ms. Ballard testified that Andrew got his behavior under control in the seventh grade and was able to learn. For the first time, Andrew participated fully in Trinity's behavior plan. Ms. Ballard opined that at the end of the seventh grade, with support services, Andrew could return to

a regular classroom. Indeed, Ms. Ballard testified, Trinity measures its success when a student returns to a regular classroom and achieves academically and behaviorally.

Finally, Mrs. Dudley testified. She confirmed Ms. Wilson's testimony that she insisted on a Behavior Intervention Plan for Andrew prior to his re-entry in eighth grade because she wanted assurance that Andrew would have behavior services in place from the first day of school. In 2001, Loveland had refused that same request. She also explained her decision, shortly after the opening of the 2002-03 school term, to move Andrew from special education classes in mathematics and science to regular education. Mrs. Dudley explained that the teaching level in special education classes was below Andrew's level, and that with his improved behavior, Andrew could "stretch" to participate in regular classes, albeit with curriculum adaptations and modifications.

Mrs. Dudley deemed Andrew's eighth grade term at Loveland as largely successful. He had few behavioral incidents, though she continued to receive reports from teachers of loud and disruptive conduct. She hoped Andrew's behavior would continue to improve. Andrew struggled with academics, particularly in language arts. He could not put together more than one or two sentences for reports, and at this time - as a ninth grade student - remained unable to write in cursive, even his own name. Mrs. Dudley stated that when Andrew left Loveland at the end of third grade, no teacher could handle him. His third grade teacher taught him in isolation. He spent most of his time outside of the regular classroom. After four years at Trinity, Andrew could be taught in a regular classroom: his behavior no longer prevented him from learning. She credited Trinity's program for allowing Andrew to gain the ability to control his behavior.

IV.     **LEGAL ANALYSIS**

The Sixth Circuit allows "additional" evidence to be considered by this Court in its review of an

administrative decision. *Metropolitan Government of Nashville and Davidson County, Tennessee*

*v. Cook*, 915 F.2d 232, 234 (6th Cir. 1990). Evidence arising from events occurring during later

school years (2002-03) is properly admitted, but only for the limited purpose of deciding whether the

IEP at issue (for the 2000-01 school year) was reasonably calculated to provide educational benefit.

*Metropolitan Board of Public Education, Government of Nashville v. Guest,* 193 F.3d 457, 463

(6th Cir. 1999). That is, evidence of later educational progress (in the 2002-03 school term) may only

be considered to determine whether the original IEP (for 2001) was appropriate. *Id.*

It is undisputed that Andrew had substantial behavioral problems during his five years within the

Loveland district prior to his departure for Trinity. SLRO Bohlen made the following Findings of Fact:

- Andrew's behavior deteriorated during his first five years in the Loveland school
  district. In third grade, Loveland evaluated Andrew for special education services.
  Behaviors of concern included hyperactivity, acting out, noises, disturbing others, losing
  control, and acting aggressively toward peers. A standardized test (Behavior
  Assessment System for Children) showed Andrew was significantly at risk for
  hyperactivity, aggression, conduct problems, learning problems and study skills.
  Loveland's MFE team determined that Andrew did not qualify for special education
  services, but failed to assess him under the SED category. SLRO Decision at 3-4,
  Certification of Record No. 17.

- Andrew's parents placed Andrew at a private alternative school, The Trinity School,
  for fourth grade (1998-99 school term). *Id.* at 4.

- Loveland undertook a MFE of Andrew early in the 2000-01 school term. The MFE
  team found that Andrew qualified for services under the designation of emotionally

16

disturbed (SED).[3]  Andrew's qualification was based on reports from Trinity personnel indicating significant social skills deficiencies and problem behaviors, including inappropriate peer contact, disruptive talk outs, a preoccupation with violence, and significant problematic and aggressive behaviors toward others.[4]  *Id.* at 5.

- The 2001 IEP  was not approved by Andrew's parents or his teachers at Trinity.  *Id.* at 6.

- When Andrew entered Trinity in fourth grade, the school had to develop a special behavior plan for him.  He had difficulty transitioning between classes.  He was impulsive, unable to initiate and maintain positive peer interaction, and pushed and punched peers.  Andrew began fifth grade with similar behavioral and attention problems.  During sixth grade Andrew showed improved attention in class, academic achievement, and  improved interactions with peers.  *Id.* at 7-8.

- During the IEP process, Loveland resisted reasonable suggestions of the Dudleys and Trinity teachers.  These included: (1) a behavior plan; (2) direct occupational therapy; (3) pragmatic language therapy to deal specifically with social skills deficiencies; and (4) placement in a small group learning environment.  With  the  provision of these services, the IEP would have provided FAPE.  *Id. at 11.*

No testimony or evidence at the September 5, 2003 evidentiary hearing disputed any of these

findings by the SLRO.  Indeed, the 2003 IEP offered by Loveland included the exact services that

SLRO Bohlen deemed necessary for FAPE in 2001.  The 2003 IEP included a behavior plan, which

provided Andrew with immediate services upon his re-entry into Loveland.  It also provided for forty-

---

[3]     Though referred to by the SLRO as SED, the proper designation is ED.  See, 34 C.F.R.§300.7.

[4]     Federal regulations set out the category of Emotionally Disturbed (ED) to include any of the following behaviors: (1) an inability to learn that cannot be explained by intelligence, sensory or health factors; (2) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (3) inappropriate behavior under normal circumstances; (4) general pervasive unhappiness or depression; or (5) tendency to develop physical symptoms or fears associated with personal or school problems.  The characteristics must be exhibited over a long period of time and to a degree that adversely affects educational performance. 34 C.F.R. §300.7.

five minutes of direct occupational therapy and forty-five minutes of direct language therapy.  The 2003 IEP,  prior to its modification at the behest of Mrs. Dudley, placed Andrew in a small group learning environment for all academic subjects,  other than social studies.  Mrs. Dudley testified that Andrew's increased ability to focus - the result of his years at Trinity - allowed him to be in regular classes for mathematics and science, as well as social studies, though with adaptations and modifications.

Andrew's 2002-03 IEP was not "virtually identical" to the 2001 IEP, as Ms. Wilson suggests.  Andrew's 2002-03 IEP provided substantially more direct services to Andrew.  These included:

- Behavior Intervention Plan in place when school began.

- Anger management group services.

- Direct behavior management services from specialist for one hour per week. (His 2001 IEP provided for services two times weekly, with no specification of the amount of time or that services would be direct rather than consultative).

- Functional Behavior Assessment.

- Daily direct access to counselor to discuss social situations and problems.

- Direct occupational therapy services.

- Direct speech therapy services.

- Daily access to sensory integration services.

Even were the services on the two IEPs  identical, however, that fact would not be determinative of the issue before this Court.  In February 2001 - when the IEP at issue was drafted - Andrew needed far greater services, especially behavioral, than upon his return to Loveland in 2002-03.  A comparison of the observations by Loveland's two special education teachers in February 2001 (Respondent's Hearing Exhibit 1) with the observation by Ms. Lawless in February 2002 Petitioner's

18

Hearing Exhibit 1) supports this conclusion. It is only Andrew's substantial improvement during the second half of sixth grade (2001) and during seventh grade (2001-02) at Trinity that allowed Andrew to return to Loveland and succeed in eighth grade (2002-03).

## CONCLUSION

This Court raised the issue of where the burden of proof rests. The party challenging the IEP bears the burden of proof. At the due process level, this burden should have been borne by the parents. IHO Favret incorrectly stated that Loveland bore this burden. There is no indication that his error had any bearing on his findings or his decision, both strongly in favor of the parents. SLRO Bohlen made no findings with regard to the burden of proof. Her factual findings and legal conclusions were strongly in favor of the parents. Following SLRO Bohlen's decision, Andrew's current placement became Trinity and Loveland filed in this Court to challenge the Trinity placement. Loveland, as plaintiff, bears the burden in this Court. This comports with IDEA's "modified" *de novo* standard of review, as well as federal and state regulations.

Loveland has not met its burden. Both IHO Favret and SLRO Bohlen found that Loveland's 2001 IEP failed to provide FAPE. No testimony or documented evidence of later educational progress presented at the September 5, 2003 evidentiary hearing disputes their findings or establishes that Loveland's 2001 IEP was appropriate.

Respondent respectfully requests this Court to affirm that Loveland's 2001 IEP denied Andrew FAPE, that Trinity was an appropriate placement for Andrew, and that Trinity's tuition was reasonable. The Dudleys will then seek reimbursement for tuition and attorney's fees.

Respectfully submitted,

/s/Phyllis E. Brown
Phyllis E. Brown (0037334)
The Law Offices of Phyllis Brown, LLC
119 East Court Street
Cincinnati, OH 45202-1203
(513) 412-7681

CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2003, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants.

J. Michael Fischer
Ennis, Roberts & Fischer
121 West 9th Street
Cincinnati, Ohio 45202

/s/Phyllis E. Brown
Phyllis E. Brown