Exhibit A

1993 WL 1318610                                                                    Page 1
**(Cite as: 1993 WL 1318610 (S.D.Ohio))**

Only the Westlaw citation is currently available.


United States District Court, S.D. Ohio, Western
Division.

BOARD OF EDUCATION OF THE
CENTERVILLE CITY SCHOOL DISTRICT,
Plaintiff,
v.
BOARD OF EDUCATION OF THE STATE of
Ohio
and
Alan and Rebecca GOLDMAN, on behalf of their
son, Michael Goldman, Defendants.

No. C-3-92-442.

Aug. 24, 1993.


FINDINGS OF FACT AND CONCLUSIONS OF
LAW; OPINION; DECISION OF THE STATE
LEVEL
REVIEWING OFFICER AFFIRMED IN PART
AND REVERSED IN PART; JUDGMENT TO BE
ENTERED
FOR DEFENDANTS, ALAN AND REBECCA
GOLDMAN, AND AGAINST PLAINTIFF,
BOARD OF
EDUCATION OF THE CENTERVILLE SCHOOL
DISTRICT, ON CLAIM THAT MICHAEL
GOLDMAN'S
PLACEMENT IN BRANTWOOD
ELEMENTARY SCHOOL DURING THE
1991-92 ACADEMIC YEAR
VIOLATED THE INDIVIDUALS WITH
DISABILITIES EDUCATION ACT; JUDGMENT
TO BE
ENTERED FOR PLAINTIFF, BOARD OF
EDUCATION OF THE CENTERVILLE CITY
SCHOOL
DISTRICT, AND AGAINST DEFENDANTS,
ALAN AND REBECCA GOLDMAN, ON
COUNTERCLAIM
SEEKING TO HAVE PLAINTIFF REIMBURSE
ALAN AND REBECCA GOLDMAN FOR THE
COSTS OF
EDUCATING MICHAEL GOLDMAN IN A
PRIVATE SCHOOL DURING THE 1992-93
ACADEMIC YEAR
AND ON COUNTERCLAIM THAT

PLACEMENT IN BRANTWOOD DURING THE
1991-92 ACADEMIC
YEAR VIOLATED SECTION 504 OF THE
REHABILITATION ACT OF 1973; JUDGMENT
TO BE
ENTERED FOR DEFENDANT, BOARD OF
EDUCATION OF THE STATE OF OHIO, AND
AGAINST
PLAINTIFF ON PLAINTIFF'S CLAIM THAT
DECISION OF THE STATE LEVEL REVIEW
OFFICER
WAS CONTRARY TO LAW, CONTRARY TO
EVIDENCE OF RECORD AND OTHERWISE
IMPROPER;
TERMINATION ENTRY.

RICE, J.

**\*1** This is a dispute about the proper educational placement [FN1] of a child with disabilities, Michael Goldman ("Michael"), who became seven years old on July 3, 1993.

> FN1. "Placement," in this opinion, refers to the assignment of a child to a particular academic setting, pursuant to an individualized education program (IEP). A placement is defined, then, by the particular manner in which an IEP is implemented in a given institutional setting.

This is also an unusually emotionally charged controversy, implicating, *inter alia:* the love of Michael's parents for him, as well as their steadfast efforts to ensure that he receive the best education for his intellectual, social, emotional and physical development; the desire and duty of experienced educators to offer this child the best placement for his needs, as they understand them; and the conflicting interests of parents and educators in having the final word regarding the manner of Michael Goldman's schooling. Further fueling the charged nature of this litigation are disagreements about the nature and extent of Michael's abilities and disabilities and conflicting expert testimony about autism [FN2] and the optimal methods to assist individuals affected with this disorder.

> FN2. Autism is a developmental disorder of brain function. Margaret L. Bauman, et

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

al., "An Update on Autism: A Developmental Disorder; Introduction," 87 *Pediatrics* v (May 1991). Autism is "a syndrome defined by a characteristic set of behaviors which include (1) a qualitative impairment in reciprocal social interaction, (2) a qualitative impairment of verbal and nonverbal communication and imagination activity, and (3) a markedly restricted repertoire of activities and interests." *Id.* Furthermore, "autism does not have a single etiology.... [Of the brain disorders,] autism is probably the most confusing ... because of the wide range of its severity and clinical manifestations and because its very nature--the social and emotional core--is difficult to quantify." *Id.*

Because of the emotional nature of this lawsuit, the Court reminds the parties that the decision herein rests on a consideration of the facts and the legal arguments presented by able counsel representing both parties. Although the Court arrives at factual findings and legal conclusions, the Court has not the capacity to arrive at conclusions regarding morality, justification, or truth. Such conclusions are, by their nature, "ultimate answers [which] cannot be given, [and which] can only be received." [FN3]

FN3. Tom Robbins, Jitterbug Perfume 383 (1985).

The case is before the Court on the appeal of the plaintiff, the Board of Education of Centerville City School District ("Centerville" or the "school district"), from the decision of the state level review officer ("SLRO"). This final administrative ruling concluded that Centerville's placement of Michael during the 1991-92 academic year was inappropriate, *i.e.,* that he was not in the least restrictive setting consistent with his needs. The SLRO ordered Michael's full-time placement in a regular education classroom as an integrated student, for the 1992-93 academic year, with appropriate educational support. The SLRO also ordered the school district to reimburse Michael's parents for the cost of any non-public education Michael would receive during the 1992-93 school year.

The school district also sues the Board of Education of the State of Ohio ("State Board"), claiming that the final decision of the SLRO constitutes a final decision of the State Board and was contrary to the evidence in the record, contrary to law and otherwise improper. Doc. # 1 at 14-15.

Michael's parents, Alan and Rebecca Goldman ("the Goldmans"), counterclaim, seeking an order affirming the SLRO's decision *in toto,* a declaration that Centerville violated Michael's rights under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (**IDEA**), and under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, an order requiring Centerville to reimburse them for the cost of Michael's non-public school education during the 1992-93 school year, as well as costs and attorneys' fees. Doc. # 20 at 17-18.

*2 The statute governing this dispute, the **IDEA**, provides states with federal funds to assist their efforts in educating disabled children as long as the states comply with the statute's goals and procedures. *Doe v. Smith,* 879 F.2d 1340, 1341 (**6th Cir.**1989), *cert. denied,* 493 U.S. 1025 (1990). The **IDEA's** principal requirement is that participating states provide a "free and appropriate public education" to all disabled children within their jurisdiction. *Id.* "[T]he 'basic floor of opportunity' provided ... consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Board of Educ. v. Rowley,* 458 U.S. 176, 201 (1982). The public education provided must be tailored to the unique needs of the disabled child through an individualized education program (IEP), prepared by the school district, the parents, and the child's teachers. 20 U.S.C. § 1401(19). Additionally, the statute requires that the education so provided must occur "to the maximum extent appropriate ... with children who are not handicapped." *Id.* at § 1412(5)(B). If a parent is dissatisfied with an IEP, the Act permits the parent to appeal to a state agency; additionally, any party aggrieved by the decision of the state agency may appeal to state or federal court. *Id.* at § 1415(b) and (c). This Court has jurisdiction over appeals from the final decision of the state education agency regarding the placement of a handicapped child. *Id.* at § 1415(e)(2).

In its review of the final decision of the state

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

education agency, pursuant to the **IDEA**, this court must answer two inquiries: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, at 206-07 (footnotes omitted). In determining whether the parents are entitled to reimbursement for the expenses of educating their child while contesting a school district's placement decision, the Court examines whether the individualized education program (IEP) proposed by the school district was appropriate. *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 373-74 (1985). If the school's proposed IEP was appropriate, the parents are barred from obtaining reimbursement for their expenses. *Id.* at 374. If, however, the school district's IEP was *in* appropriate, and if the placement the parents unilaterally made *was* appropriate, then the parents may obtain reimbursement. *Id.* at 370-374.

The Court conducted a trial upon the merits on June 28, 29, 30th and on July 1, 1993. The Court now issues its decision in this matter, after having reviewed the testimony heard in open court and the entire administrative record. Findings of fact and conclusions of law are entered pursuant to Fed.R.Civ.P. 52. Briefly stated, the Court concludes that Michael's placement during the 1991-92 school year in Brantwood Elementary School violated the **IDEA** (thus affirming the implicit conclusion of the SLRO on this point) and that the Goldmans are not entitled to reimbursement for tuition and related expenses incurred as a result of placing Michael in a private school during the 1992-93 academic year (thus reversing the decision of the SLRO on this point). The Court also concludes that the placement in Brantwood did not violate the Rehabilitation Act of 1973. The Court does not reach the SLRO's order placing Michael in a regular education classroom with defined services and training, as it finds those portions of the order moot. Finally, the Court dismisses the claims against the State Board.

## I. Findings of Fact

**\*3** The following findings of fact are based on this Court's consideration of stipulations entered into by the parties in the final pretrial order, the entire administrative record, and the testimony and evidence introduced at trial. Those facts which were

stipulated to are so indicated; facts from the administrative record are identified as such, and all other facts are based on evidence presented at trial. There was no attempt to cite to a specific page of the trial transcript [FN4] to support each fact found as a result of the trial proceedings.

> FN4. The trial transcript was entered as Docs. # 45, # 46, # 47, and # 48. This decision and entry will make occasional citation to specific language or facts developed at trial; the citation will be to "Doc. # xx," without an additional indication that material from trial is being cited.

### A. The Parties

1. Alan and Rebecca Goldman are the parents of Michael Goldman who was born on July 3, 1986. Michael is a "handicapped [FN5] person" as that term is defined in 34 C.F.R. § 104.3(j), and a "qualified handicapped person" as that term is defined in 34 C.F.R. § 104.3(k). The Goldmans reside in the geographic boundaries of the plaintiff's school district. (Stipulated) (hereinafter "ST").

> FN5. The Court is aware that the term "handicap" has fallen into disfavor and that three years ago the criticisms of the term were sufficient to prompt Congress to replace the term "handicap" with the term "disability" when it changed the name of the **IDEA** predecessor statute, the Education for All Handicapped Children Act, Pub.L. No. 94-142, 89 Stat. 773 (1975), to the Individuals with Disabilities Education Act, Pub.L. No. 101-476, 104 Stat. 1141 (1990). Nonetheless, the Court is bound by the terms utilized in the statutes, regulations, and throughout this litigation. A prisoner of language, the Court intends no disrespect to any party in its selection of key terms in this decision. *See generally*, David M. Engel, *Law, Culture, and Children with Disabilities: Educational Rights and the Construction of Difference*, 1991 Duke L .J. 166.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2. The school district is a "local educational agency" as that term is defined in the **IDEA**, 20 U.S.C. § 1401(a)(8), and a "recipient [of federal funds]" as that term is defined in 34 C.F.R. § 104.3(f). ST.

3. The school district is a party aggrieved by the final decision of a state- level review officer and, as such, requests that this Court vacate the decision of the SLRO. Doc. # 1 at 2, 16. ST.

4. Michael is a seven year old boy who has been diagnosed as autistic and who has received special education services from the plaintiff since the summer of 1989. Autism is a developmental disability significantly affecting verbal and non-verbal communication and social interaction, generally evident before the age of three, that adversely effects educational performance. Michael, because of his disability, needs special education and related services. ST.

5. As a child with autism, Michael is a "handicapped child," as that term is defined in 34 C.F.R. § 300.5. Since Michael fits the definitions of a person or a child with a handicap, he is covered by the **IDEA** and its implementing regulations, which seek "to insure that all handicapped children have available to them a free appropriate public education which includes special education and related services to meet their unique needs, [and] to insure that the rights of handicapped children and their parents are protected." 34 C.F.R. § 300.1. Michael is also covered by the Rehabilitation Act of 1973, Pub.L. 93- 112, *as amended,* particularly section 504 of that Act, codified at 29 U.S.C. § 794, which prohibits an otherwise qualified individual with a disability, "solely by reason of her or his disability, [from being] excluded from the participation in, [from being] denied the benefits of, or being subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (1993).

6. The Board of Education of the State of Ohio ("State Board") is the state agency responsible for the supervision of the system of public education in Ohio. Ohio R.C. § 3301.07 (Anderson's 1990). The State Board, *inter alia,* exercises policy forming, planning, and evaluation responsibilities for the public schools in Ohio, administers and supervises the allocation and distribution of state and federal funds to public schools, and adopts procedures and

guidelines for the education of handicapped children. Ohio R.C. § 3301.07(A), (C) and (J). The State Board is the "State educational agency," as that term is defined in the **IDEA**, *i.e.,* the Board is the agency primarily responsible for the State supervision of public elementary and secondary schools. 20 U.S.C. § 1401(a)(7).

*4 7. The State Board appointed the state level review officer (SLRO) who issued the decision that Centerville challenges in this action. Doc. # 1 at 11, *Id.* at Ex. B. at 7. The State Board was required to hear the appeal from the initial level due-process hearing, 20 U.S.C. § 1415(c), and was authorized to appoint the SLRO. Ohio Administrative Code, 3301-51- 02(G)(12)(1991).

B. Chronological Background

3. Upon the Goldmans' arrival in the Dayton area in the first part of 1989, they enrolled Michael in the preschool program of a local Temple. Doc. # 5, Item B, Due Process Hearing Transcript at 161 (hereinafter cited DPTrans. at __ ). The preschool teacher suggested that Michael be tested by a psychologist. The testing was completed in May of 1989, and indicated that Michael had many of the characteristics listed in the diagnostic manual for autism. However, he was not diagnosed at that time as autistic. *Id.* The parents were, nonetheless, concerned; subsequent testing at the Menninger Clinic confirmed there were developmental problems. Then, the Goldmans, at the suggestion of their pediatrician, contacted Centerville to determine what type of preschool services the district could offer Michael. *Id.* at 162-64. Centerville's psychologist visited the Goldmans at their home, observed Michael and determined that he was eligible for special education classes.

9. Michael began receiving special education classes from the school district in the summer of 1989. [FN6] *Id.* at 165.

> FN6. Michael was eventually formally diagnosed as autistic in April of 1991.

10. The Goldmans signed an individualized education program (IEP) in August, 1989, and Michael began school at Driscoll elementary school. ST.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

11. In May, 1990, an IEP was written for Michael with the approval of the Goldmans for the 1990-91 school year, and Michael returned to the program at Driscoll. ST.

12. By the spring of 1991, the Goldmans had become increasingly concerned about Michael's progress at that facility. They toured a program operated by the Montgomery County Board of Education for children with communication disorders located at Brantwood elementary school. The school district hired Dr. Julie Rubin, who observed Michael in his classroom at Driscoll and in a meeting with the Goldmans. Dr. Rubin recommended a half-day of schooling for Michael in a classroom designed for autistic children with a teacher and aides highly trained in the education of autistic children, and with peers functioning at approximately the same developmental level. Dr. Rubin recommended that the other half-day of schooling might include integration into a classroom for typical children where the emphasis would be on peer interaction and socialization. ST.

13. The Goldmans' concerns about Driscoll were based on their growing familiarity with autism. The Goldmans had read widely and deeply about autism, believed that emerging techniques could be useful to Michael, and were concerned that the staff at Driscoll lacked the necessary training and information to assist their child. In the words of Mrs. Goldman, the teacher "didn't have enough knowledge of autism to know what was possible." DPTrans. at 181. They continued to inform themselves about developments in the field.

*5 14. In May of 1991, Centerville proposed a draft IEP for the 1991-92 academic year. The Goldmans thought the proposed IEP was inadequate and notified Janice Brickley, the administrator of the special education programs at Centerville, that they believed that Michael had already achieved at least 40% of the goals and objectives on the IEP and that they did not believe that the techniques and goals identified on the IEP were appropriate for Michael. The Goldmans were also concerned that the Centerville teachers who would work with Michael, particularly those in the "regular" education classroom, lacked the familiarity with autism to work effectively with Michael. The Goldmans provided Janice Brickley with information they had learned about autism.

15. Ms. Brickley investigated all of the information given to her by the Parents, as follows:

(a) She read about the approach used by Ivar Lovaas at the University of California at Los Angeles, who believes in strict behavior management.

(b) She talked to Dr. Julie Rubin about the TEACCH (The Treatment and Education of Autistic and other Communication Handicapped Children) program at Chapel Hill, North Carolina, because Dr. Rubin had served an internship in that program.

(c) She attended meetings on facilitated communication, and observed students using that technique.

(d) She called Sioux City, Iowa, and discussed that school district's approach to placement of autistic children, either in regular classes or in special education classes.

(e) She called Hudson, Ohio and inquired concerning its approach to education of autistic children.

(f) She reviewed the Handbook on Autism.

16. While the district continued to examine the information offered by Michael's parents, and while the consultant, Dr. Rubin, was formulating her opinion regarding placement alternatives, Michael was working with a private tutor, Lisa Thompson, hired by the parents to work with Michael during that summer. Ms. Thompson worked with Michael for six weeks over that summer; the Goldmans were very pleased with the progress she made with Michael during that time. [FN7] Lisa Thompson teaches in a self-contained classroom at the Brantwood Elementary School in the program operated by the Montgomery County Board of Education for children with communication disorders.

> FN7. Michael also attended summer school at Camp Shawnee, a program operated by Centerville for children with disabilities.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

17. In early August, 1991, an IEP was developed for Michael, and the school district offered the following placement for him:
Half-Day in a regular kindergarten classroom at the Centerville Kindergarten Village, with a kindergarten teacher assigned to the class, with another special education teacher or aide facilitating the integration of Michael and the other children with special needs into the classroom; and
Half-day in a special education resource room, staffed with a special education teacher and aide; Michael would receive related services during this part of the day.
The Goldmans rejected this placement. ST.

18. The Goldmans did not agree to this proposed IEP, due to their standing concerns that the Centerville regular education teachers lacked specialized training in autism. The Goldmans were concerned that without such training, the integrated experience could prove difficult for Michael, who, on the one hand, could benefit from such a setting, yet, on the other, could run significant risks in such an environment without someone familiar with the particular challenges he would face as a result of his autism. The Goldmans indicated that the Brantwood placement would be preferable, given the circumstances, especially the fact that Lisa Thompson would be Michael's classroom teacher. Her personal relationship with Michael Goldman aside, Ms. Thompson was well qualified as his teacher: she had been teaching children with disabilities for nine years, had a bachelor's degree in special education, a master's degree in curriculum development, had taught at least eleven autistic children, prior to working with Michael, and had attended a range of national and local conferences concerning autism. Doc. # 45 at 47-50.

*6 19. Ms. Cathy Moore was the special education teacher who would have been responsible for teaching Michael the goals and objectives on listed on his IEP had the Goldmans selected the placement at Centerville Kindergarten Village ("CKV"), proposed by the school district. Although Ms. Moore is also well qualified and has extensive experience in teaching autistic children, the Goldmans rejected the CKV placement and selected the placement at Brantwood for Michael.

20. An additional IEP meeting was held regarding the Brantwood program on August 26, 1991, at the Grant Learning Center. Doc. # 45 at 57-58. Mr. Goldman signed the IEP, indicating that the IEP had been reviewed, and that the parents had accepted the placement at Brantwood as set forth in the IEP. Defendant's Ex. C at 2. The IEP identified, among other goals, "reverse mainstreaming/inclusion to the maximum extent possible (to be determined in the fall) recess, assemblies, cafeteria." "Reverse mainstreaming," generally, is the practice of bringing non-disabled children into a class of children with disabilities to interact with those disabled children. ST. While the parties disputed the precise meaning of "inclusion," Ms. Brickley understood the term as a rough synonym for mainstreaming, i.e., disabled children's participation in regular education classes for typical, non-disabled children.

21. Notwithstanding their agreement on the IEP itself, the parties misunderstood the duration of the IEP to which they had agreed. Mrs. Goldman believed that the IEP was for a temporary placement in Brantwood, that the placement would last "only for as long as it will take Centerville to have people trained," DPTrans. at 198, in Centerville Kindergarten Village, the location where she preferred that Michael attend school. The School Board understood that the placement was an ordinary year-long placement outside the district.

22. Michael entered Brantwood in late August of 1991.

C. The Continuing Relationship Between the School District and the Goldmans; The Placement in Brantwood

(a) The Relationship Between the School District and the Goldmans

23. Brantwood was an out-of-district school, and the public transportation initially provided required that Michael remain on the bus for almost 90 minutes in the morning. The Goldmans did not want to subject their son to such a long ride, so Mrs. Goldman drove Michael to Brantwood daily, until the transportation routing could be shifted. As a result of driving her son to school, Mrs. Goldman had frequent contact with the teachers and staff. She learned that Michael was subject to discipline--sitting in the "time out" chair--on a frequent basis, and became concerned that such disciplinary techniques, without providing Michael

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610                                                                                    Page 7
(Cite as: 1993 WL 1318610 (S.D.Ohio))

with the skills to understand and control his own
behavior, would be futile, or worse, would stimulate
the very conduct they sought to eliminate. Mrs.
Goldman and Lisa Thompson, the teacher with
whom she previously had a good relationship, had
profound disagreements about approaches to and
philosophies of discipline, and the relationship
between Mrs. Goldman and Ms. Thompson
deteriorated. At an unspecified point during the fall,
the Goldmans noted that there were few
opportunities for reverse mainstreaming/inclusion,
and that there was little or no opportunity for
Michael to interact with typical children.

*7 24. To encourage Centerville to provide the
appropriate level of training for teachers whom the
Goldmans still hoped would work with Michael, the
Goldmans had Michael tested again, to determine
the level and type of his impairments and abilities.
Dr. Bloom, the doctor identified by the Goldmans
to perform the testing, concluded that Michael was
a "high functioning autistic five-year old who was
also hyperlexic." DPTrans. at 219-220. Hyperlexia
is the precocious ability to handle written material
coupled with an impairment of verbal
communication. DPTrans. at 220. The Goldmans
hoped this diagnosis would motivate Centerville to
initiate the type of training they had been seeking.

25. The school district believed that its teacher
training program was adequate, and refused the
Goldman's request for additional training.
Centerville believed that its special education
teachers were highly qualified, and there was no
need to have its regular education staff undergo the
type of training envisaged by the Goldmans.

26. (a) The Goldmans, remaining dissatisfied with
the reverse mainstreaming/inclusion components of
the Brantwood program, requested a meeting to
discuss their concerns and revise their son's IEP.
The meeting took place in early December, 1991.
The Goldmans requested modifications in:
   (1) the hours and nature of reverse
mainstreaming/inclusion;
   (2) the hours and nature of speech and
occupational therapy and adaptive physical
education;
   (3) the "domestic domain" portion of the IEP, to
be replaced with a personal daily schedule;
   (4) the reading, math, and writing goals in the
IEP; and
   (5) techniques to control Michael's in-class

behavior.
During the three-hour meeting, the team was
unable to complete discussion of the items, and
members of the team indicated they needed
additional information relating to the parents'
concerns about reverse mainstreaming/inclusion.
The meeting was scheduled to resume on January 8,
1992, when the team members would have the
additional information. However, the Goldmans, in
the interim, canceled the meeting, stated they
intended to request a due process hearing, did not
request that Michael's placement be changed, and
did not ask Ms. Brickley about the status of her
investigation into training alternatives on autism.
Nor did Ms. Brickley notify the Goldmans of the
status of her investigations.

(b) Michael's behavioral problems during the fall of
1991 caused the staff at Brantwood to conclude that
mainstreaming would not be appropriate while such
problems lasted. Doc. # 47 at 124-25. These
behavioral problems, inappropriate scratching and
biting, diminished greatly over the year at
Brantwood, Doc. # 45 at 85, yet there was no effort
to increase the reverse mainstreaming/inclusion
opportunities as his conduct improved. As an
outgrowth of the December, 1991, IEP meeting,
Ms. Thompson's supervisor explored the
mainstreaming opportunities available for Michael
at Brantwood. Id. at 97. However, no evidence was
introduced which indicated there was a subsequent
change in the reverse mainstreaming/inclusion
opportunities made available to Michael.

*8 27. At the Goldmans' request, the school district
assembled an evaluation team to conduct a
multi-factor evaluation of Michael during the ninety
days commencing on December 2, 1991. The
Goldmans submitted to the evaluation team a report
prepared by Dr. Bloom of the Child Evaluation
Center in Louisville, Kentucky. The report
presented the findings of a psychological evaluation
he conducted of Michael Goldman on September
20, 1991. [FN8] Before submitting Dr. Bloom's
report to the evaluation team, the Goldmans edited
the report to delete the names of the cognitive tests
administered by Dr. Bloom, the results achieved, a
portion of the diagnostic impressions, and the bulk
of the interpretation of the test results. ST.

   FN8. The stipulated facts indicate the
   evaluation was conducted on "September

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610                                                                    Page 8
(Cite as: 1993 WL 1318610 (S.D.Ohio))

20, 199*2.*" That date is a typographical error, as the Goldmans could not have submitted to the evaluation team a report which had not yet been prepared.

28. On February 28, 1992, the parents received a draft copy of the school district's multi-factor evaluation of Michael. The parents met with school district personnel on March 2, 1992, but refused to discuss the report since they were in profound disagreement with its conclusions that Michael's cognitive abilities were significantly below average. The school district, while they had examined the report of Dr. Bloom, the expert who had diagnosed Michael in the fall of 1991, found Dr. Bloom's diagnosis inconsistent with their own observations of Michael. The school district disagreed with Dr. Bloom's report and with the Goldman's own evaluation of their son's abilities. The Goldmans stated that they did not agree with the assessment of Michael's cognitive abilities, and the school district agreed to an independent evaluation.

29. The school district and the Goldmans agreed that Dr. Cathy Telzrow, an employee of the Cuyahoga County Special Education Service Center in Cleveland, Ohio, would conduct the independent evaluation of Michael's cognitive abilities. Dr. Telzrow conducted the evaluation of Michael on April 13, 1992. The district paid for a speech therapist selected by the Goldmans to accompany Michael to support him during the evaluation. Dr. Telzrow's report of that evaluation states that she was unable to score the results of the testing "due to a failure to obtain Michael's consistent, active participation with the required tasks." [FN9] ST. While the Goldmans were awaiting the results of the independent evaluation, they and the school district engaged in a mediation effort. That attempted resolution of the dispute failed.

FN9. This is typical of the difficulty in diagnosing cognitive functioning of persons with autism. It is challenging to determine, in a given instance, whether the results of a test are due to the subject's cognitive ability, or are due to the subject's sheer lack of desire to participate in the test, itself a manifestation of autism.

30. On April 22, 1992, the Goldmans requested a due process hearing, claiming that Michael's current placement was not appropriate since he was not in the least restrictive setting consistent with his needs. Such request is authorized by the provisions of 20 U.S.C. § 1415(b). ST.

31. Over the spring and summer of 1992, Janice Brickley contacted the Ohio Department of Education to determine if the autism task force had recommended any particular training program for educational personnel. She learned that the task force was recommending a training program developed at the Indiana Resource Center for Autism at Indiana University. Ms. Brickley called the Miami Valley Regional Center for Handicapped Children and asked that the Center consider providing this training in the Dayton area as soon as possible. The Center responded, and the training was scheduled for October 29 and 30, 1992. In addition, the Center scheduled Barry Prizant, a nationally recognized expert on autism, to speak on September 11, 1992, about the language aspects of autism.

*9 32. Two of the school district's speech therapists, as well as a speech supervisor from the Montgomery County Board of Education, were scheduled to attend facilitated communication training in Cincinnati, Ohio, which was being presented by personnel from the University of Syracuse.

33. The school district scheduled IEP meetings on April 6 and June 26, 1992, but the Goldmans declined to attend the meetings. On June 22, the Goldmans and the school district signed a stipulation, which postponed the due process hearing scheduled to begin on Monday, June 29, 1992. Instead, the parties scheduled a meeting on June 29th of educational representatives of the school district and the Goldmans to develop recommendations for submission to Michael's IEP team for the 1992-93 school year. The stipulation further provided that the school district and the Goldmans would each pay the fees and expenses of their respective representatives. The stipulation also provided that on June 30, 1992, the IEP team would meet to consider the recommendations of the educational representatives, and to develop an IEP for the 1992-93 school year. ST.

(b) The Placement at Brantwood Elementary School

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

34. Michael remained at Brantwood through the 1991-92 academic year. Whatever the difficulties between his parents and the school district, he made educational progress during that year. Michael learned a system which provided rewards for learning, and he progressed to a system which delayed the rewards for learning specific tasks; he developed some semi-independent (*i.e.* without prompting by a teacher) ability to play board games and complete portions of interlocking-pieces puzzles; he made some progress in his reading skills, especially in his ability to recognize sight words and match verbs and pictures; he was able to count the number of items depicted in a picture with 80% accuracy; by the end of the year, his tendency to scratch when agitated, as well as his occasional biting, had greatly diminished, to the extent that he was able to remain in the room even when other students were crying or screaming; and he learned to kick, thanks to the efforts of another child in his class. Doc. # 45 at 77-93. His utilization of spoken language increased from one-word utterances to slightly longer sentences. *Id.* at 93. Progress was not uniform, however: he did not become able to tell time by looking at the face of a clock. *Id* . at 83. On the whole, the year was a productive one for Michael: in addition to the developments inventoried above, he incorporated the routine of the classroom and learned to follow it independently, an important step in the education of those with autism, and was able to develop reading skills and the capacity to answer questions [FN10] about the material he had read. Doc. # 47 at 189, 193.

> FN10. The Court does not mean to imply that answers were oral. Michael was given a variety of means to communicate his answer (Doc. # 47 at 193), including techniques of facilitated communication. *Id* . at 25, 215.

35. On the other hand, there is little evidence that the IEP language of "reverse mainstreaming/inclusion" was honored. Reverse mainstreaming describes the participation of children from "regular" or non-disabled classes in classes for students with disabilities, while inclusion describes disabled children's participation in "regular" education classes, *i.e.* traditional mainstreaming. [FN11] While Michael did have

behavioral problems during the year, the "reverse mainstreaming" was limited to one third grade student playing for fifteen minutes each week with Michael. Doc. # 45 at 106. There was no effort by Michael's teacher, Lisa Thompson, to include Michael in regular education classes. *Id* . at 108.

> FN11. The "recess, assemblies, and cafeteria" language in the IEP describes traditional mainstreaming, rather than reverse mainstreaming. Doc. # 45 at 59.

*10 36. In each instance, the judgment to reverse mainstream in a limited fashion or whether to make efforts at inclusion, depended not on an assessment of Michael's needs, but on other factors. The *timing* of reverse mainstreaming turned on the amount of time that the third grade teacher, whose student visited with Michael, thought the student could spare outside the classroom; the *number* of students reverse mainstreamed depended on a single request for volunteers to the third grade class located closest to Michael's classroom, a practice inherited from previous years. Decisions regarding reverse mainstreaming, then, rested largely on administrative convenience and routine practices of years gone by, and did not rest on the needs of the individual for whom the IEP was developed. Doc. # 45 at 59-60. The decision not to follow up on the *inclusion* language in the IEP rested on Ms. Thompson's assessment of whether Michael had developed skills "at, or above the level [where] the other children would [have been] functioning," not whether *he* was able to benefit, even if he were functioning at a less elevated skill level than children in a regular classroom. Doc. # 45 at 108.

37. Even the opportunity for traditional mainstreaming identified by the "recess, assemblies, cafeteria" language was hollow. There was no interaction between Ms. Thompson's class and regular education students at lunch, and Ms. Thompson's class even arrived in the lunchroom before the regular education students, in order for her to have sufficient time to work with students whose IEPs required development of meal-time skills. Doc. # 45 at 109-110.

38. In December of 1991, the parents brought their concerns about the IEP's reverse mainstreaming/inclusion language to the attention

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

of the school district personnel in the attempt to modify the terms of that document. The school district's personnel investigated the parents' claims. However, at no time thereafter did the school district make an effort to change Michael's program to conform to the conditions of the IEP. Moreover, neither at the hearing nor in the record, did the school district introduce evidence to show it was impossible or not in Michael's educational interests to obtain additional reverse mainstreaming/inclusion opportunities in his education at Brantwood. Michael finished the 1991-92 year at Brantwood, with his IEP unchanged and with his educational program lacking the requisite degree of reverse mainstreaming/inclusion as stated in the IEP.

D. The 1992-93 IEP

39. While the pre-due process hearing procedures were underway, the school district and the Goldmans agreed to discuss the IEP for the 1992-93 school year. On June 29, 1992, ten educators met for approximately twelve hours to develop an IEP for Michael Goldman for the 1992-93 academic year. Experts for the school district and the Goldmans were present, as were representatives of and teachers employed by the school district. [FN12] The Goldmans did not attend the meeting. The participants did not agree on Michael's level of functioning; consequently, establishing the goals and objectives of the IEP was quite difficult. Nonetheless, the educators gradually arrived at a provisional plan, a sketchy understanding, of what Michael needed in an IEP, even though the attendees disagreed about his level of functioning and the degree of autism training appropriate for Centerville's staff.

> FN12. The following individuals attended the June 29, 1992 IEP meeting: Dr. Nan Negri and Brenda MacMillan, consultants for the Goldmans; Dr. Julie Rubin, a consultant for the School District; Janice Brickley, David Diller, Pat Buckingham and Trish Wathen, employees of the School District; and Mel Rife, Lisa Thompson and Bonnie Gregory, employees of the Montgomery County Board of Education.

*11 40. The participants tentatively agreed on a range of current levels of functioning for Michael, and on the goals and objectives for a proposed IEP for Michael for the 1992-93 school year. In addition, a tentative compromise was reached on the following issues:
(a) In addition to training already planned by the School District, an in-service would be conducted on August 24 and 25 at Centerville Kindergarten Village on integration of students with disabilities in regular classrooms. During that time, Dr. Julie Rubin would present information on autism, with Brenda MacMillan and Dr. Negri submitting any written information which they believe would be helpful to the staff in understanding Michael's needs. The staff could then request additional assistance as needed through appropriate channels.
(b) When autism is recognized as a separate classification under Ohio's Rules for the Education of Handicapped Children, Michael will be reclassified and serviced under those rules.
(c) The Parents may attach any comments they wish to Michael's March, 1992 multi-factor evaluation.

41. The Goldmans attempted to cancel the IEP meeting scheduled for June 30, 1992. The school district stated the meeting would proceed as scheduled. The Goldmans then attended the meeting with Dr. Nan Negri, a consultant they had hired who had attended the June 29th meeting. Dr. Negri explained a number of changes which the Goldmans wanted made in the proposed IEP. ST.

42. An IEP meeting was held on July 17, 1992, and a meeting was held between the Mrs. Goldman and the school district psychologist on July 20, 1992. No agreement was reached between the school district and the Goldmans on an IEP for Michael for the up-coming 1992-93 school year. ST.

43. At those two July meetings, the parties disagreed about the training necessary for regular education staff who would be working with Michael. The Goldmans believed significant amounts of training were necessary, while the School Board believed that the training already scheduled was adequate and that their special education staff, which would be working with Michael for half the day, consisted of persons who were experienced professionals in no need of additional, mandatory training.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

44. Given their hope of a favorable decision from Independent Hearing Officer (IHO), and the parties' inability to reach a compromise, the Goldmans decided to reject the school board's proposed IEP and, instead, enrolled Michael in the Montessori school of Centerville, a private school. They were especially concerned that Montessori stimulate Michael's ability to socialize and communicate with peers; academic development was less of an issue. DelRe Dep. at 11.

45. The due process hearing requested by the Goldmans was conducted on July 27 and 28, 1992, before W. James Owen, pursuant to rules promulgated by the Board of Education of the State of Ohio. Mr. Owen was an independent hearing officer ("IHO") selected pursuant to said rules. The IHO issued his Final Decision on August 31, 1992, ruling in favor of the school district. The IHO found as follows:

  *12 (a) Michael's actual placement at Brantwood and the alternative placement option offered by the Plaintiff in the 1991-92 school year were in the least restrictive setting, consistent with his needs and designed to provide an appropriate education.
  (b) The Plaintiff did not fail to properly conduct the multi-factor evaluation, nor did the evaluation result in an inappropriate classification of Michael as multi-handicapped.
  (c) The Plaintiff complied with all applicable law in its education of Michael Goldman.

The IHO made no decision on Michael's educational placement for the 1992-93 school year.

46. At the commencement of the 1992-93 school year, without the school district's agreement, the Goldmans enrolled Michael in a non-public school. ST.

E. The Academic Year at Montessori

47. In addition to enrolling Michael in the Montessori program, the Goldmans paid for a classroom aide to smooth his education in the mainstreamed and relatively unstructured Montessori classroom. Michael began the year by attending a full day of school, from 8:15 a.m. to 3:00 p.m. The program included activities ranging from a preschool to a first grade level and accepted children from three to seven years old. Michael was the first child with autism to attend this program in Centerville; only one teacher in the program had

taught a child with autism before, and that was fifteen years previously. The parents also paid for one of their experts, Brenda MacMillan, a speech pathologist from Louisville, Kentucky, to provide one full day of training on autism and on Michael's particular manifestations of that disorder, and also paid her to visit the school occasionally.

48. Michael had, at best, a difficult year at Montessori. The evidence showed that, on the one hand, he did not advance academically and became less independent during the year. Most significantly, his ability to tolerate a full day of school--i.e . function in a complex social environment--deteriorated. On the other hand, he did benefit from the social atmosphere of a mainstreamed classroom: he was invited to birthday parties at classmates' houses, and learned some of his fellow students' names; moreover, his fellow students were fond of Michael. His abilities to take turns and exercise a modicum of self- discipline improved. Lane-Potter Dep. at 72-75, 79, 70, 53-54.

49. However, these interpersonal benefits and slight improvements in some areas of behavior are minor compared to his overall performance in school. His abilities to interact socially and his academic skills remained static or declined during the year. Michael began the year able to attend a full day of school, from 8:15 a.m. to 3:00 p.m. By December, the consensus of the Montessori staff was that he should attend one half day of school, from 8:15 to 11:15 a.m ., as he was sufficiently disruptive in the afternoon to disturb other children and to create difficulties for the general atmosphere. Lane- Potter Dep. at 23-24. During the afternoon, he was unable to cope with the demands the teachers and the Montessori environment were placing on him and he became agitated. DelRe Dep. at 27-28. The teachers' stress levels increased as they attempted to calm Michael and reduce the level of ambient noise in the classroom; the dynamics of the afternoon session shifted when Michael became agitated. Id. at 29. The Goldmans met with the teaching staff and agreed that, effective January, Michael would attend school for one-half day, i.e. for the morning session only. Id. The teachers also requested that the schedule of the morning session be modified so that Michael was picked up at closer to 11:00 a.m., rather than at 11:15, because during that time, "Michael had a hard time being still." Id. at 30.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**\*13** 50. Michael also became somewhat prompt-dependent during the course of the year; he grew accustomed to the frequent presence of the classroom aide at his side or near him, and participated less in the overall activities of the group than he did earlier in the year. In general, the aide was near Michael, worked with him frequently, and if Michael worked with another child, that action was in response to a prompt from an adult in the room. Lane-Potter Dep. at 55. Michael also needed the aide close to him in order to remain quiet during group activities. *Id.* at 86. Michael grew to work less with other children than he did earlier in the year: "the winter was upsetting for him, and he's just never gotten back in the group." *Id.* at 55, *see also* 59. Michael also showed less of a desire to perform individual work than he did in the fall. *Id.* at 59.

51. As far as his academic abilities, he was never formally evaluated at the beginning of school year, so there was no base line from which to judge his development, or absence of same, over the year. Lane-Potter Dep. at 74. Nor was it possible to develop defined, individualized goals owing to the lack of knowledge about his skill level, and his teachers' lack of training in special education. The evaluation completed by his teacher, not designed to measure progress, but merely to record activities, indicated that he "sometimes" cooperated in finishing teacher-chosen activities, "sometimes" concentrated while working, and "sometimes" obeyed reasonable commands, and that there was little change in these abilities throughout the year. Lane-Potter Dep. 78-79. He became *less* able to choose his own learning activities or to cooperate in a group; he needed teacher direction while working throughout the year; and he was unable to follow instructions directed at a group of which he was a member, without help. *Id.* at 79-81. Michael improved slightly in his ability to put away his work and in being self-disciplined. *Id.* at 79. Additionally, over the course of the year, the staff placed fewer demands on Michael to minimize the possibility of disruptions: "areas that he should be pushed in he isn't because we want to keep a normal work--noise level." *Id.* at 60. Finally, for reasons which are unclear, Michael never brought his Canon communicator, a facilitative communication device, to Montessori. Lane-Potter Dep. at 64. Consequently the staff at Montessori were unable to employ a technique that at least some educators, and those close to Michael, have seen him utilize

effectively.

52. The school district offered to convene a committee to write an IEP for delivery of the related services of occupational therapy and speech therapy for Michael during the 1992-93 academic year while Michael Goldman was enrolled in a private school. The Goldmans did not respond to this offer. ST.

**F. A Placement Rejected, Centerville Kindergarten Village**

53. If the Parents had enrolled Michael in the school district's Centerville Kindergarten Village (CKV) for the 1992-93 school year, he would have attended a regular kindergarten class during the morning, staffed with a regular education teacher. The school district's regular kindergarten program is half a day in length. Children with disabilities were integrated into two regular education classes at the CKV. There were two to three children in each class, with a regular education teacher in each class, as well as a special education teacher and educational aide who alternated between the two classes. During the afternoon, Michael would have been in a special education resource room, where he would have received individualized instruction designed to reinforce the concepts introduced in the regular kindergarten classroom. The related services of speech and occupational therapy would have been provided to Michael in either of the settings. During 1992-93, the four children with disabilities, including one child who has been diagnosed as autistic, who were enrolled in this program at Centerville Kindergarten Village, made progress on their individual IEP goals and objectives. Additionally, staff employed by the school district who would have worked with Michael during the 1992-93 school year, had he been enrolled in the School District, attended the training sessions conducted at the Miami Valley Regional Center for Handicapped Children on autism and the language aspects of autism. Early in the 1992-93 academic year, they participated in a workshop conducted by an area educational expert on collaboration between regular education and special education teachers in developing an integrated program for children with disabilities. In addition, two speech and language pathologists employed by the school district, one of whom would have worked with Michael, attended a workshop on the use of facilitated communication for children with autism and cerebral palsy. Dr.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Julie Rubin conducted a training session with the staff at Centerville Kindergarten Village, and provided background information on autism, as well as examples of specialized instruction techniques successful in the education of autistic children. Dr. Rubin then observed each child in the district who is autistic, and made recommendations to their classroom teachers on educational techniques to employ in delivering the goals and objectives on their IEPs. Dr. Rubin is available throughout the school year to consult with staff as questions might arise regarding the education of autistic children in the School District. CKV staff involved in integrating students with disabilities into the regular classrooms were provided with daily shared planning time, and an additional half day each month for collaboration.

*14 54. The staff who would have worked with Michael, had he worked during the 1991-92 and/or 1992-93 school years, were well qualified to teach autistic children. The regular education teachers, Suzanne Crum and Rachel Auman, attended the in-service training on autism conducted by Dr. Julie Rubin in August, 1992, and they attended the collaboration training conducted by Dr. Fran Landers in the fall of 1991 and the fall of 1992.

55. Ms. Cathy Moore is the special education teacher at Centerville Kindergarten Village. She has Ohio certification in learning disabilities, developmental handicaps, behavioral disorders, and multi-handicaps. She also has supervisor's certification. She has taught special education classes for the School District since January, 1981. Prior to that, she worked as an educational assistant for Montgomery County Schools in a program for autistic children. She worked two summers at a summer camp for autistic children. She is Assistant Director for a residential home for autistic adults, which is owned by Autistic Enterprises, Inc. Ms. Moore is Vice Chairman of the Board of Trustees of that organization. Ms. Moore uses diagnostic teaching, and is able to assess a child's difficulties in the regular education environment and intervene with appropriate strategies.

56. There are four educational aides who worked with Ms. Moore during the past two school years. While it is not clear which of these aides would have worked with Michael Goldman, each was qualified to work with autistic children. Carolyn Snow has worked in special education for the

school district for four and a half years. During that time, she has worked with autistic children. Prior to her employment with the School District, Ms. Snow was an educational aide on a bus owned by Montgomery County Schools, which transported children with severe communication and behavior disorders to school. Nancy Carlson worked with Cathy Moore for the 1991-92 school year and during the first half of the 1992-93 school year. She previously worked as an assistant in a program for multihandicapped children, as well as in the program for children with severe behavior handicaps at Cline elementary. Prior to her employment with the School District, she worked at St. Joseph Residential Center for children with severe behavioral handicaps. She has been working on her degree in special education, and will complete it this summer. As part of her college curriculum, she took classes in mainstreaming of children with disabilities into regular education classes, and one of those classes addressed autism. Barb Brown replaced Nancy Carlson in January, 1993. She attended the in-services on autism and collaboration which were presented in the fall of 1992. Ida Pooler worked with Cathy Moore during the 1991-92 school year. She substituted for the School District for a number of years in the multihandicapped program, and is the mother of an autistic child who is now an adult.

G. The Appeal to the SLRO

*15 57. On August 31, 1992, the IHO ruled in favor of the school district. On September 1, 1992, the Goldmans appealed the decision of the IHO, and the State Board appointed a state level reviewing officer (SLRO), Heather Sowald, to hear the appeal from the IHO's decision and to issue a final order. In reaching her decision, the SLRO simply relied on the administrative record; she took no additional evidence or arguments from either the parents or the school district.

58. The SLRO issued a final order on October 2, 1992, reversing the decision of the IHO. The SLRO's decision concluded that, absent a consensus as to Michael's degree of intelligence, or a determination by an independent evaluator, there was no possibility of determining Michael's I.Q. or level of ability. Accordingly, the SLRO reviewed the record to determine the appropriate institutional setting for him and concluded that, as that there was no IEP in place for Michael's 1992-93 school year,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

"Michael should be placed on a full- time basis in a regular education classroom as an 'integrated' student, with appropriate educational support, in order to receive a free appropriate public education." The SLRO implicitly found, therefore, that the educational placement at Brantwood had been *in* appropriate for Michael, as it was not in the least restrictive setting consistent with his needs. In so doing, the SLRO overruled the IHO's determination of that issue, an act which the SLRO was authorized to perform. Her decision on placement, that "Michael should be placed on a full-time basis in a regular education classroom as an 'integrated' student, with appropriate educational support," Doc. # 5, Ex. O at 12, rested on the factual predicate that Michael's placement at Brantwood was not in the least restrictive setting consistent with his needs. She ordered that Michael receive a full-time education with "typical" students in the 1992-93 school year.

59. The SLRO also ordered, *inter alia,* additional support services [FN13] for Michael, further training [FN14] for his teachers, and that if, during the appeal, the Goldmans placed Michael in a private school, the school district was required to reimburse them for the costs of such education. The SLRO stated: "the District shall be responsible for reimbursing the parents promptly for any such tuition and/or tutoring fees which have been incurred on Michael's behalf, since the beginning of the 1992-93 school year until such time as the teacher(s), any aide(s), and Michael's classmates have been appropriately trained, an IEP has been signed by the parties, and Michael begins receiving a free appropriate public education in the District." Doc. # 5, Ex. O at 15, also ST.

> FN13. The decision read: "To the extent that Michael needs support services, such as communication aids for his educational program, the school district must provide at least one such item for Michael's learning needs."

> FN14. The decision read: "In order for Michael to receive an appropriate education as an "integrated" student in a regular education classroom, his teacher(s), any necessary support staff, and tangentially, his classmates, will need more

training specifically geared toward autistic children, in order for Michael to receive a free appropriate public education."

60. Other than the role of the Board of Education of the State of Ohio in appointing the SLRO and in devising training manuals for the IHO and the SLRO, the plaintiff offered no testimony describing the participation of the State Board in the events constituting this lawsuit. The Board of Education of the State of Ohio had no role in the hearing before the SLRO, Doc. # 45 at 136-38, nor did it influence, in any way, the outcome of the proceeding before the IHO or the SLRO. Ohio law provides that the decision of the SLRO, however, is the final decision of the Board of Education of the State of Ohio and binds that body and its employees. *Id.* at 150.

**\*16** 61. The school board appealed the decision of the SLRO to this Court on October 16, 1992.

### II. Conclusions of Law

1. This Court has jurisdiction over this appeal from a final decision of the state education agency regarding the placement of a handicapped child. 20 U.S.C. § 1415(e)(2). The Court bases its decision on the preponderance of the evidence. *Id.*

2. The SLRO's "qualified *de novo* hearing," [FN15] reviewing the IHO's decision, complied with the **IDEA's** requirement that "the officer conducting such [second-level] review make an independent decision upon completion of such review." 20 U.S.C. § 1415(c)(1990).

> FN15. Doc. # 5 (Administrative Record), Item O at 12.

3. This Court examines the final decision of the SLRO under a *de novo* standard of review, while giving "due weight to the state administrative proceedings in reaching its decision." *Roncker v. Walter,* 700 F.2d 1058, 1062 (**6th Cir.**), *cert. denied,* 464 U.S. 864 (1983). This Court gives "due weight," understood as a rebuttable presumption of validity, to those portions of the SLRO's decision and order which are consistent with procedures established in the **IDEA.** Those portions of the SLRO's order which are inconsistent with the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

procedures established in the **IDEA** are not entitled to "due weight."

4. Where administrative proceedings involve more than one level of decision- making, as they did in the instant case, the Court gives "due weight" to the *final* level of an administrative decision-making process. *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 **(6th Cir.**1990). *See also Karl v. Board of Educ. of Genesco Cent. Sch. Dist.,* 736 F.2d 873, 877 (2d **Cir.**1984) (" [D]eference may not be eschewed merely because ... [the SLRO] disagrees with the [initial] hearing officer.).

5. In reviewing a final administrative decision regarding an educational placement, in this case the SLRO's decision, this Court examines: (1) whether the educational agency complied with procedures set forth in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* and (2) whether the individualized educational program (IEP) developed through the Act's procedures is reasonably calculated to enable Michael to receive educational benefits. *Board of Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982) (footnotes omitted), *Thomas,* 918 F.2d at 624. Specifically, the Court examines whether the educational agency has adopted the plans, policies, and assurances required by the Act, and whether it created an individualized educational program (IEP) conforming to the statutory requirements of 20 U.S.C. § 1401(19). *Rowley* at 206 n.27. The Court also examines whether the IEP developed through the Act's procedures provides the child with identifiable educational benefits. *Id.* at 207 n.28. In this case, the Goldmans are not challenging the process by which the Brantwood IEP was finalized, or the content of the IEP itself; rather, the parents challenge the implementation of that IEP at Brantwood.

*17 6. To determine whether the IEP provided educational benefits, the Court focuses on whether the child received the substantive guarantees of the Act. Such guarantees include:
(1) "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction," *Rowley* at 203;
(2) the requirement of "procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated

with children who are not handicapped," 20 U.S.C. § 1412(5)(B) (the "mainstreaming requirement"); and
(3) the parallel guarantee of procedures to assure that "special classes, separate schooling, and/or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*
However, these substantive guarantees mandate only that the child benefit from the education provided; they do not require that the education maximize the potential of each handicapped child. *Doe v. Smith,* 879 F.2d 1340, 1341 **(6th Cir.**1989), *cert. denied,* 493 U .S. 1025 (1990).

7. In determining whether a child benefits educationally, the term "benefit" means to develop and improve skill levels, or, in a nutshell, to progress educationally. *Board of Educ. v. Diamond,* 808 F.2d 987, 991 (3rd **Cir.**1986) ( "the Act requires a plan of instruction under which educational *progress* is likely."). The progress must be real and more than *de minimis:* "children learn *something* over the course of time simply from existing and watching television, even if they never attend a day of school. Under the Act, an educational benefit is not conferred anytime a student is not left to vegetate." *Chris D. v. Montgomery County Bd. of Educ.,* 753 F.Supp. 922, 931 (M.D.Ala.1990). Michael benefitted educationally at Brantwood; he did not benefit educationally at Montessori.

8. In considering whether the mainstreaming requirement--"that mainstreaming be provided to the *maximum* extent appropriate"--has been fulfilled, courts must recognize that the requirement "indicates a very strong congressional preference [for mainstreaming]" and that "in some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming[;] the perception that a segregated institution is academically superior for a handicapped child may reflect no more than a disagreement with the mainstreaming concept." *Roncker,* 700 F.2d at 1063. Where a child is placed in a segregated facility, "the court must determine whether the services which make that placement superior could feasibly be provided in a non-segregated setting. If they can,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the placement in the segregated school would be inappropriate under the Act." [FN16] *Id.* Finally, in determining whether a child has been mainstreamed to the maximum extent appropriate, the Act and "its regulations do not contemplate an all-or- nothing education system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of services. Thus, the school must take intermediate steps where appropriate.... If the school officials have provided the maximum appropriate exposure to non-handicapped students, they have fulfilled their obligation under the [Act]." *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1050 (5th **Cir.**1989). The Brantwood placement, in its initial phase, *i.e.* the first several months at Brantwood during the autumn of 1991, could have been consistent with the mainstreaming requirement, given Michael's behavioral problems; the district's failure to implement, at any point during the year, when the behavioral problems had diminished, the "reverse mainstreaming/inclusion" provision of the IEP resulted in that placement constituting a violation of the **IDEA's** mainstreaming requirement.

> FN16. The *Roncker* court also allowed that the cost of a particular placement may be considered in deciding whether that placement is appropriate. The school district has not, at any point, raised cost as a defense to any placement.

\*18 9. When reviewing a decision ordering reimbursement of parents' educational expense incurred as a result of removing a child from a public school placement, and enrolling that child in a private school, the parents must show that the IEP proposed by the school district was *in* appropriate and that the actual education provided *was* appropriate. *School Comm. of Burlington v. Department of Educ.,* 471 U.S. 359, 372-74 (1985). Following *Burlington,* the **Sixth Circuit** has determined that

> Removal of the disabled child to a private school at public expense is only contemplated under the Act when the public school is unable to provide the child with an appropriate education and the private school is able to do so. Removing a child from a partially mainstreamed program at a public school, which otherwise provides an

appropriate academic instruction and the only objection to that program was a failure to fully mainstream, and placing that child in a non-mainstreamed program in a private school does not satisfy the goals of the Act.

*Gillette v. Fairland Bd. of Educ.,* 932 F.2d 551, 554 (6th **Cir.**1991). Reimbursement for Michael's education in Montessori after his removal from the Centerville school system was not contemplated by the Act. The school district could have provided Michael with an appropriate education; Montessori did not provide him with an appropriate education.

10. With respect to the claim that the school district violated Michael Goldman's rights under Section 504 of the Rehabilitation Act of 1973, "[t]he elements of a cause of action ... are as follows: (1) the plaintiff is a "handicapped person" under the Act; (2) the plaintiff is "otherwise qualified" for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and, (4) the relevant program or activity is receiving federal financial assistance." *Landerfeld v. Marion Gen. Hosp.,* 994 F.2d 1178, 1180 (6th **Cir.**1993). In addition to these elements, "proof of discriminatory intent is required to prevail." *Pesterfield v. TVA,* 941 F.2d 437, 441 (6th **Cir** .1991). The plaintiff, to emphasize the obvious, has the initial burden of alleging and proving the elements of the prima facie case. *Id., Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 n.5 (6th **Cir.**1985). The Goldmans, the counterclaim plaintiffs, have failed to establish their prima facie case, let alone prove their case on the merits. The parents have not established that Michael was denied mainstreaming opportunities "solely by reason of his handicap" or that the school district acted with an intent to discriminate.

11. The **burden** of **proof** rests on the school district to show that Michael's placement at Brantwood was consistent with the **IDEA.** The school district bears this burden as the party challenging the SLRO's decision that the placement at Brantwood violated the **IDEA** and the SLRO's order that Michael be placed full- time in a regular education classroom. [FN17] The administrative record, and the testimony and exhibits introduced at trial, showed, by a preponderance of the evidence, that the Brantwood placement was *in* appropriate, as the district failed to implement Michael's IEP.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Since Brantwood was not the least restrictive setting consistent with his needs, the Court concludes that the placement was in violation of the **IDEA's** mainstreaming requirement.

> FN17. **Sixth Circuit** decisions have ruled that "the party challenging the terms of an IEP should bear the burden of proving that the educational placement established by the IEP is not appropriate." *Cordrey v. Euckert,* 917 F.2d 1460, 1469 **(6th Cir .1990),** *cert. denied,* 111 S.Ct. 1391 (1991) , *Doe v. Defendant I,* 898 F.2d 1186, 1191 **(6th Cir.1990).**
> These decisions, however, do not control the allocation of the **burden of proof** herein. The plaintiffs in those cases, the parents (not the school district, as in the case at bar), challenged the initial decision of the school district as well as the ultimate finding rendered following the administrative hearing. The **IDEA** places primary responsibility for establishing and revising IEPs on the school districts (20 U.S.C. § 1414(a)(5)) and supervisory authority to make certain that such duties are fulfilled on the state educational agency (20 U.S.C. § 1414(a)(5) and (6)). Therefore, the **Sixth Circuit's** conclusion that the **burden** of **proof** rests on the party challenging *both* levels of administrative decision- making is consistent with the **IDEA,** since a party challenging an IEP and a final decision of a state agency should, rightly, bear the **burden** of **proof** in federal court.
> These decisions do not address the harder question, at issue here, of which party should bear the **burden of proof** when the parents prevailed at the final level of administrative review and the school district appealed from the state-level decision. Concluding that the burden remains solely on the parents would yield an anomalous result: whether or not the parents prevailed before the state educational agency, they would *always* bear the **burden** of **proof** when the case arrived in district court, whether as plaintiffs or defendants. Such a result is at variance with the **IDEA's** placement of final responsibility for statutory compliance on the state educational agency. The **burden of proof** in district court should rest on the party challenging the final decision of the state education agency, which is often, but not always, the party challenging the IEP. Such an allocation of the **burden of proof** is consistent with the division of responsibility between the state and the school district and complies with the directive to give "due weight" to the final level administrative proceedings. *Roncker* at 1063.
> Appellate courts and at least one district court have recognized the different policy considerations controlling the allocation of the **burden of proof** at different levels of administrative and judicial proceedings and have recognized that, depending on the locus of the action, the burden may rest with the party challenging the IEP or the party challenging the final level state decision. *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988); *Spielberg v. Henrico County Pub. Sch.,* 853 F.2d 256, 258 n.2 (4th Cir.1988), *cert. denied,* 489 U.S. 1016 (1989); *Hiller v. Board of Educ. of Brunswick Cent. Sch. Dist.,* 743 F.Supp. 958, 967 (N.D.N.Y.1990).
> The Court, therefore, places the **burden of proof** on the school district to show that the Brantwood placement was appropriate and consistent with the **IDEA.** Were this Court to have followed *Cordrey* and *Doe,* however, its findings of fact and legal conclusions concerning the Brantwood placement would have remained unchanged.
> Since the Court has determined that the SLRO's decision regarding reimbursement was not consistent with the procedures established by the **IDEA** and is not entitled to "due weight," the Goldmans bear the **burden** of **proof** to show that this order should be affirmed. However, even if the school district were to have had the **burden** of **proof** on this issue, the Court's findings of fact and legal conclusions would have remained unchanged.

**\*19** 12. The Goldmans bear the **burden** of **proof** on their counterclaim that the school district

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610                                                                    Page 18
**(Cite as: 1993 WL 1318610 (S.D.Ohio))**

violated the Rehabilitation Act of 1973 by failing to educate their son in the least restrictive setting appropriate to his needs. The administrative record, and the testimony and exhibits introduced at trial, showed, by a preponderance of the evidence, that the placement in Brantwood did not violate Section 504 of the Rehabilitation Act of 1973; consequently the Goldmans do not prevail on their counterclaim alleging violation of the Rehabilitation Act of 1973.

13. The Goldmans bear the **burden** of **proof** of showing that the SLRO's order that the school district reimburse Michael's parents for the cost of any non- public education Michael would receive during the 1992-93 school year should be sustained. This order to the school district that they repay the Goldmans for the cost of any non-public education their son is to receive during the pendency of the appeal from the SLRO's decision is, by its own terms, sweeping, and inconsistent with the provisions of the **IDEA**, as interpreted by the Supreme Court. The Court, accordingly, does not give this portion of the decision "due weight." The administrative record, and the testimony and exhibits introduced at trial, showed, by a preponderance of the evidence, that the placement at Montessori was *in* appropriate. Therefore, the Goldmans are not entitled to reimbursement for the costs of placing Michael at Montessori, or for expenses related to that placement.

### III. Opinion

On this review of the final decision of the state level review officer, there are two core issues before the Court: *first,* whether Michael Goldman's placement in Brantwood during the 1991-92 academic year was the least restrictive setting consistent with his needs, and, *second,* whether the parents are entitled to reimbursement for the tuition and other expenses they incurred in educating their son in the Montessori program during the 1992-93 academic year. Additionally, that branch of the Goldmans' counterclaim, contending that the school district violated Michael's rights as guaranteed under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, is before the Court.

Before reaching these issues of substantive law, the Court addresses procedural matters raised by the parties. Plaintiff has argued strenuously that this Court should *not* give "due weight" to the SLRO's decision as the SLRO's *de novo* review did not

comply with principles of administrative law. [FN18] Doc. # 42 at 29-30. This argument fails. Plaintiff does not identify the principles of administrative law which the decision allegedly violated. While plaintiff argues that the SLRO's placement order in the absence of an IEP is inconsistent with the **IDEA**, the SLRO did take steps, though limited, to explain the rationale justifying her order. Moreover, the SLRO's review, while plaintiffs may object to its conclusions, comported with the **IDEA's** requirement that "the officer conducting such [second-level] review make an independent decision upon completion of such review." 20 U.S.C. § 1415(c)(1990). The decision in *Roncker* requires this Court to give "due weight" to conclusions of the administrative proceedings mandated by the Act, as long as those conclusions were reached by procedures defined by the Act.

> FN18. The Plaintiff argues strenuously that the SLRO erred in her factual determinations and legal conclusions. However, the plaintiff does not allege that the **IDEA's** procedural requirements were breached, by the parents, or by the IHO and/or by the SLRO at the respective stages of administrative review.

**\*20** The Court, accordingly, does review the SLRO's ruling to determine if its conclusions were arrived at through procedures contemplated by the Act. In this review of the SLRO's decision, the Court is careful to "requir[e] adherence to the procedural demands of the Act, while [also] giving utmost deference to specific educational decisions once it is determined that they stem from the procedures outlined in the Act." *Doe v. Defendant I,* 898 F.2d 1186, 1188-89 (**6th Cir.**1990). Consequently, the Court examines the SLRO's decision to insure that it complies with the **IDEA**. An initial observation about the SLRO's decision: it was not a precise, tightly reasoned, carefully supported document. The analysis of its reasoning is, perforce, more interpretive than this Court would prefer.

The SLRO issued two principal rulings. *First,* the officer ordered that Michael be educated "on a full-time basis in a regular education classroom as an 'integrated' student." Doc. # 5, Item O at 12. The SLRO explicitly criticized the Brantwood

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

placement, *id.* at 10, and, since she rejected the school district's proposed IEP calling for a half-day in a regular education classroom and a half-day in a special education classroom, implicitly found that such placement at Brantwood, a full day in a segregated classroom, had violated the **IDEA.** Her order of a particular educational placement for Michael, without an IEP, rested on her finding that there was no consensus about his cognitive abilities and that he did not fare well in the segregated setting. These implicit and explicit findings are consistent with the procedures established in the **IDEA.**

It is difficult to determine if the Court should give due weight to the order that Michael be educated full-time, in a regular education classroom--an educational policy decision--in the absence of an IEP, as it is not clear that this policy decision was made through procedures contemplated by the **IDEA.** On the one hand, courts occasionally order a that a child be educated in a particular setting and require the parties to create an IEP for that setting. *Oberti v. Board of Educ. of Clementon Sch. Dist.,* 801 F.Supp. 1392, 1407 (D.N.J.1992), *aff'd,* 1993 U.S.App. LEXIS 12641 (3d **Cir.** May 28, 1993). Likewise, it was the practice during the school district's and the Goldmans' efforts to develop an IEP, to agree on a setting and then write the IEP for that setting. Doc. # 47 at 119-123. On the other hand, the **IDEA's** implementing regulations are clear: "each public agency shall insure that each handicapped child's educational placement [, *i.e.* the institution in which the child is educated] ... is based on his or her individualized educational program." 34 C.F.R. § 300.552(a)(2)(1992).

The Court determines that it is unnecessary to decide this close question as the order concerning Michael's full-time education in a regular classroom for the 1992-93 academic year is moot at this stage of the proceedings. [FN19] The Goldmans withdrew Michael from public education and enrolled him in Montessori's program. As a ruling on the SLRO's order concerning full-time regular education carries no practical or legal effect at this point in time, *see* note 19, *supra,* the Court does not pass judgment on that portion of the SLRO's final order.

FN19. Despite the ruling of the SLRO, prospectively ordering that Michael be

educated full-time, in a regular classroom during the 1992-93 school year, is moot, whether the Brantwood placement comported with the **IDEA** remains a live controversy and is not moot. The dispute about the placement at Brantwood turns on the extent that Michael Goldman may be mainstreamed in accord with the **IDEA** and is not moot as it is "capable of repetition, yet evad[es] review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498 515 (1911). "Conduct is capable of repetition if there is a reasonable expectation or a demonstrated probability that the same controversy will recur." *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1040 (5th **Cir.**1989). The underlying controversy here--the extent to which Michael Goldman may be mainstreamed pursuant to **IDEA**--is without question capable of repetition, and as a factual matter, *is* repeating itself as this decision is being drafted, as the parties are unable to agree whether a mainstreamed or segregated setting is more appropriate for Michael for past years and/or for the 1993-94 academic year. *See Daniel R.R.* at 1040-41 (finding a reasonable expectation that a school district will continue to refuse to mainstream plaintiff, despite expiration of IEP, the continuing development of the plaintiff, a child with Down's Syndrome, and parents' removal of the plaintiff from the public educational system.); *Abney v. District of Columbia,* 849 F.2d 1491, 1495 (D.C.Cir.1988) (The plaintiff sought declaratory relief of a past violation of the Act; the Court rejected defendant's mootness argument notwithstanding the parties' agreement on a current IEP. The Court reasoned that the controversy, regarding the extent of education necessary when the plaintiff was experiencing a periodic worsening of a chronic medical condition, was *capable* of repetition, and, therefore, not moot. This recurring controversy will evade review, as a placement and an IEP cover an academic year (nine months) and judicial and administrative review of an IEP invariably lasts longer than nine months. *Rowley,* 458 U.S. at 186 n.9.
The SLRO's placement order is moot as it

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610                                                                    Page 20
**(Cite as: 1993 WL 1318610 (S.D.Ohio))**

is not capable of repetition--the SLRO will not be called upon again to render a decision concerning a prospective placement in and for the 1992-93 academic year, based upon Michael's perceived capabilities as of that time. *See generally Greene v. Harrisville Sch. Dist.,* 771 F.Supp. 1, 3-5 (D.N.H.1990) (concluding that the common strand in controversies under the Act that are capable of repetition, yet evading review, consists of "the possibility that the school districts would continue *policies* which plaintiffs claimed were both offensive to [the Act] and harmful to them. *Id.* at 5).

**\*21** The Court further concludes that the portion of the SLRO's decision ordering the school district to reimburse the parents for the cost of any non- public (private) education that they could or would incur in the future violates the procedures in the **IDEA**. Therefore, the Court does not give due weight to that portion of the decision. Prior to the due process hearing the parents did not request the school district to reimburse them for any future costs of private education for Michael. At the due process hearing, there was no testimony regarding the appropriateness of the education at Montessori, nor could there have been, since Michael was not enrolled in that program until one month after the hearing was held. As the SLRO did not hear additional evidence about the education at Montessori, she was unable to pass on the propriety of same. Finally, there is no provision of **IDEA** which would justify the order of *prospective* reimbursement for the costs of *any* private education which may or may not occur. As this prospective order for private school reimbursement, without a showing as to its appropriateness, does not "stem from the procedures outlined in the Act," *Doe v. Defendant I,* 898 F.2d at 1189, the Court does not give due weight to that portion of the SLRO's decision. The Goldmans have the **burden** of **proof** of showing, by a preponderance or greater weight of the evidence, that this portion of the SLRO's order should be affirmed.

The Goldmans have argued that this Court has the authority to order a particular placement for Michael during the 1993-94 academic year and that this Court *should* order his "full-time placement in a regular education class, with age-appropriate peers,

with necessary supplemental aids and services." Doc. # 40 at 12, Doc. # 20 at 18.

The Court concludes that while as a doctrinal matter, it has the power to make such a decision, [FN20] the time is not ripe for the Court to make such a ruling in this opinion. [FN21] There was no evidence at trial presented about Michael's current capacities; indeed there was significant disagreement about Michael's capacities as they existed eighteen or twenty-four months ago. To order that Michael be educated in a particular setting, or to supervise the writing of an IEP in the absence of evidence about the current level of Michael's abilities and disabilities, would be an act of supreme judicial irresponsibility.

FN20. The **IDEA** explicitly grants the courts broad power to craft relief. The statute states that the district court "shall grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(e)(2). There is little explicit restriction on the Court's power to order relief.
However, the Supreme Court, appellate courts, and the entire approach of the statute, indicate that, except in unusual instances, federal courts should defer to the mechanisms created by the act to arrive at educational decisions for children with disabilities. The Supreme Court has repeatedly "cautioned that courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy." ' *Rowley* at 208, *citing San Antontio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 42 (1973). The Court has also stated that, as a general rule, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Rowley* at 208. The Fifth **Circuit** indicated that under the **IDEA's** predecessor statute, judicial involvement in educational policy decisions was possible, but that a determination of "circumstances [that] might call for the judicial modification of an IEP" was a "thorny issue," that was best left unaddressed until circumstances required such a decision. *Tatro v. State of Texas,* 703 F.2d 823, 830 (5th **Cir.**1983),

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*aff'd in part, rev'd in part on other grounds sub nom Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883 (1984)). The Act itself, by creating a web of relationships between parents, school districts, and state boards of education, supported with procedural safeguards, indicates that primary responsibility for the placement of children under the Act lies with the parties and procedures emphasized in the Act, not with an independent judiciary reviewing an administrative decision, various levels, and months, removed, from a placement decision regarding a particular academic year. The Court's power to craft broad relief, then, should be exercised sparingly. When that power is exercised, the Court should order a placement that is consistent with the procedural and substantive requirements inherent in the **IDEA**.

FN21. The Court notes that it has scheduled a hearing on precisely this topic within one week of the date of this decision and entry, on Saturday, August 28, 1993.

Finally, the State defendant, the Board of Education of the State of Ohio, has moved for judgment as a matter of law. Finding such motion well-taken, the Court now orders judgment as a matter of law for said defendant. While there is no doubt that the Board of Education of the State of Ohio *can* be a party to an action under the **IDEA**, *School Comm. of Burlington v. Department of Educ.,* 471 U.S. 359, 362-363 (1985), that entity *should* not have been a party to the instant dispute as plaintiff offered no evidence indicating that it violated federal law in appointing the SLRO or otherwise participated in the events underlying this action.

**\*22** These preliminary matters aside, the Court turns to the substance of this litigation.

A. The Placement in Brantwood

At the due process hearing, the Goldmans alleged that the placement of their son in Brantwood was in violation of the mainstreaming requirement, specifically that it was not the least restrictive

setting consistent with Michael's needs. 20 U.S.C. § 1412(5)(B).

It is worth emphasizing the unusual nature of the Goldmans' claim. Unlike many plaintiffs in cases brought pursuant to the **IDEA**, who challenge the *procedures* relied upon in forming the IEP, or who claim that the *contents* of the IEP fail to address the needs of their disabled child, the Goldmans challenge the school district's refusal to *implement* the reverse mainstreaming/inclusion term of an IEP with which they are otherwise satisfied. The procedures the parties utilized were fair to the Goldmans. Through those procedures, the Goldmans, after all, *rejected* the placement offered by the school district at CKV, indicated that they favored the Brantwood placement, at least on a temporary basis, understanding that it offered less mainstreaming opportunities than the CKV placement which contained one-half day in a regular education classroom, and eventually obtained the placement they sought with an IEP they found acceptable. The parents object to the school district's conduct on another basis, namely, that the district failed to comply with the terms of the IEP, and, especially, with those provisions of the IEP which track one of the few substantive guarantees of the **IDEA**--that a child be mainstreamed to the maximum extent appropriate, consistent with his needs. Understanding the IEP as a contract, metaphorically, the Goldmans do not allege that the school district negotiated in bad faith or presented them with a contract of adhesion or containing otherwise offensive terms; rather, the Goldmans claim that the school district breached one of the terms of the contract and seek judicial enforcement of a term of a contract freely entered into by both parties. [FN22]

FN22. In this context, it is important to point out that the school district has been patient with the Goldmans and has offered placements and written IEPs for Michael that have come close to providing what the parents seek for their child. After the parents requested a due process hearing, thereby expressing formally their objection to the district's performance, the district still arranged a twelve hour meeting to discuss their child's IEP for the following year. After the parents placed Michael in Montessori, the district was careful to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610
(Cite as: 1993 WL 1318610 (S.D.Ohio))

contact the parents about development of an IEP for the speech and occupational therapy for which Michael remained eligible. The placement offered at CKV during the 1992-93 academic year was a hybrid of the placement the parents gained the previous year, a segregated facility with a highly experienced special education teacher, and the placement selected unilaterally by them for the 1992-93 academic year, a mainstreamed setting in a typical classroom with non-disabled children. The school board's reasonableness does not excuse their failure to mainstream Michael at Brantwood. The Court, in its day, has encountered a number of heartless government functionaries and callous bureaucrats. The school district staff and teachers are not part of that set. Instead, Centerville personnel involved in this lawsuit appear dedicated and qualified, compassionate and professional.

The IHO denied the Goldmans' claim and found that the Brantwood placement was the least restrictive setting consistent with Michael's needs, and thus appropriate, as conforming to the provisions of the **IDEA**. The SLRO, as a practical matter, reversed the IHO's decision, that the Brantwood placement was appropriate, finding, implicitly, that the Brantwood placement was not the least restrictive environment consistent with his needs. Based on a review of the entire administrative record, as well as the evidence introduced at the trial, the Court now affirms that portion of the SLRO's decision and ruling that the placement in Brantwood was not the least restrictive environment consistent with Michael Goldman's needs, *i.e.,* that Michael did not receive reverse mainstreaming/ inclusion at Brantwood sufficient to comply with the **IDEA**.

In *Roncker,* 700 F.2d 1058, the **Sixth Circuit** set forth the analytic framework to apply to claims that a disabled child was not being mainstreamed according to the requirements of the Education for All Handicapped Children Act, the **IDEA's** predecessor statute. Ms. Roncker appealed from the district court's affirmance of the school district's determination that her severely mentally retarded child did not require a mainstreamed placement and

could be placed in a segregated facility. *Id.* at 1060-62. The **Sixth Circuit** held that the district court did not examine the school district's failure not to offer a mainstreamed placement with the requisite degree of scrutiny. *Id.* The **Circuit** Court explained that the mainstreaming requirement--"that mainstreaming be provided to the *maximum* extent appropriate"--"indicates a very strong congressional preference [for mainstreaming]" and that "in some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming[;] the perception that a segregated institution is academically superior for a handicapped child may reflect no more than a disagreement with the mainstreaming concept." *Roncker,* 700 F.2d at 1063.

*23 This language defines the approach [FN23] district courts must apply to claims that a particular placement is inconsistent with the mainstreaming requirement. District courts should examine the lack of mainstreaming opportunities offered a disabled child in order to verify that the *absence* of mainstreaming is justified and does not represent a resistance to the terms of the statute. The absence of mainstreaming, placement in a segregated facility, is justified where it is not "feasibl[e]" to provide services offered in the segregated facility in the mainstreamed setting. *Id.* Moreover, the showing that a child received educational benefits at a segregated school is not sufficient to conclude that the placement was consistent with the mainstreaming requirement. The **Sixth Circuit** requires more: district courts must demand that school districts consider the *twin* goals of the **IDEA** --that a child receive educational benefits and that the child receive the maximum amount of mainstreaming possible --- in their educational placements. Accordingly, courts must "determine whether the services which make that placement superior could feasibly be provided in a non-segregated setting." *Roncker* at 1063. Following *Roncker,* this Court examines whether the lack of reverse mainstreaming/inclusion is justified. Specifically, the court examines whether such services "could [have] be[en] feasibly provided" by the district." *Id.* This Court also follows the *Roncker* court's "require [ment] of a *de novo* review but ... giv[ing] due weight to the state administrative proceedings." *Id.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610
(Cite as: 1993 WL 1318610 (S.D.Ohio))

Page 23

FN23. The issue herein is different from that presented in *Roncker* . The Goldmans challenge the school district's failure to implement the mainstreaming terms of an IEP to which they and the school district agreed. In *Roncker,* Ms. Roncker challenged the school district's refusal to write an IEP for a mainstreamed placement and the district's insistence on placing her son in a segregated environment.

Michael Goldman was not educated "to the maximum extent appropriate ... with children who are not handicapped." 20 U.S.C. § 1412(5)(B). The evidence adduced at the hearing, and contained in the administrative record, established that there was virtually no mainstreaming, reverse mainstreaming, or inclusion provided to Michael during his placement at Brantwood. There is no dispute that Michael's IEP recognized the reverse mainstreaming/inclusion requirement as one of his goals for the year. The first page of this document provided for "reverse mainstreaming/inclusion to the maximum extent possible (to be determined in the fall) recess, assemblies, cafeteria." While this phrase may not exemplify lucid prose, it does establish a requirement that Michael receive as much reverse mainstreaming and/or inclusion as he could profit from during the year. [FN24] Nor is there any dispute that the parents called deficiencies in the implementation of the IEP to the attention of the school board in December of 1991. Both Ms. Thompson and Ms. Brickley testified that the Brantwood staff investigated additional mainstreaming opportunities available at Brantwood after the December, 1991, meeting. Finding of Fact 26(b), *supra* at 18. Ms. Thompson testified that the behavior which initially indicated that mainstreaming would be inappropriate decreased significantly over the course of the year. *Id.* However, there was no evidence of any actions taken to increase Michael's reverse mainstreaming/inclusion opportunities following the December, 1991, meeting.

FN24. The possible explanation that "to the maximum extent possible" refers not to what was possible for Michael to profit from, but what was possible for the district to provide, would turn the statute on its head. Such an interpretation would define

administrative convenience, rather benefit to disabled children, as the touchstone of the mainstreaming requirement, a result at odds with the statutory purpose of assuring that "all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services *designed to meet their unique needs."* 20 U.S.C. § 1400(c) (emphasis added).

*24    Regarding    the    "reverse mainstreaming/inclusion to the maximum extent possible," the school district took virtually no steps to meet that self- imposed goal, or even to come close. The evidence established that the "reverse mainstreaming" provided consisted of 15 minutes per week with a single third grader. For Michael, fifteen minutes per week is not "reverse mainstreaming ... to the maximum extent possible." The evidence also established that there was virtually no attempt at inclusion, at educating Michael with "regular" or non- disabled children. Nor did the evidence establish that there was an effort to include Michael in other activities with non-disabled children. For Michael, eating in the same cafeteria as non-disabled children, yet at a segregated table, does not constitute mainstreaming or inclusion "to the maximum extent possible." The evidence showed that Michael's class arrived in the cafeteria before the other children, further limiting the time during which Michael could interact, even at a minimal level, with typical children.

The evidence also established that the lack of additional reverse mainstreaming, mainstreaming and/or inclusion opportunities was *not* the result of an informed, educational policy judgment that Michael was unable to participate in such activities. Instead, the evidence demonstrated that the absence of such services rested on considerations of administrative convenience and prior practice, specifically a teacher's concern that her third-grade student, reversed mainstreamed with Michael, not remain out of the classroom for more than 15 minutes per week, as well as Ms. Thompson's judgments that Michael could only benefit from inclusion if he functioned at a level where other typical children were functioning [FN25] and that she should only request volunteers for reverse mainstreaming from the third grade class across the hall, as she had done in previous years. Under the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

IDEA, these are insufficient reasons for failing to comply with an IEP or for failing to provide a mainstreamed education to an eligible child. While Michael did have behavioral problems which, in the fall of 1991, may well have prevented consideration of mainstreaming or inclusion, such problems do not explain the virtual absence of any but *minimal* reverse mainstreaming, nor do they explain the failure to increase mainstreaming opportunities over the course of the year as Michael's behavioral problems decreased.

> FN25. This rationale for a refusal to mainstream has been explicitly rejected by the Fifth Circuit. In *Daniel R.R.*, the Fifth Circuit noted that "mainstreaming may have benefits in and of itself.... In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from non-academic experiences in the regular education environment." 874 F.2d at 1047-48.

The Court also notes that the school district provided little evidence which sought to justify the lack of reverse mainstreaming/inclusion opportunities. The school district presented no evidence purporting to show that it was not feasible to offer additional reverse mainstreaming/inclusion to Michael during his time at Brantwood. There was no evidence of behavioral problems throughout the year which would have precluded Micheal's availing himself of such activities. In fact, the evidence showed that Michael's behavioral problems deceased significantly over the year, and that the school district took no corresponding steps to increase the opportunities for reverse mainstreaming/inclusion.

**\*25** The Fifth Circuit, in a challenge to a school district's refusal to offer mainstreaming opportunities to a six-year old boy with Down's Syndrome, determined that even where placement in a segregated classroom is appropriate, courts "must still ask whether the child has been mainstreamed to the maximum extent appropriate." *Daniel R.R.*, 879 F.2d at 1050. The Circuit Court found that "the school [district] must take intermediate steps, where appropriate" to provide mainstreaming opportunities, and cautioned that

"the Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Id.* at 1050, 1048. Given the lack of a showing that it was not feasible for the school district to offer Michael the opportunity to participate with typical children in some activities, the extent of reverse mainstreaming/inclusion offered, 15 minutes per week, can only be described as a token effort. The IDEA requires more.

The fact that the Goldmans favored, in fact, applied pressure for the placement in Brantwood does not relieve the school district of its obligation, which it agreed to in the IEP, and which is contained in the IDEA, to provide mainstreaming and/or reverse mainstreaming. This case differs from *Cordrey v. Euckert*, 917 F.2d at 1465-68, where the appellate court affirmed the district court's decision that a school district's IEP was in accord with the Act. The appellate panel determined that the parents had no basis to challenge the school district's allegedly inadequate procedures regarding an IEP meeting, since the parents unreasonably rejected the district's offer to schedule a meeting, and thereby waived their right to complain of procedural improprieties. *Id.* at 1465. In the case before the Court, even after the Goldmans indicated they favored placement in Brantwood, the district signed an IEP explicitly requiring "reverse mainstreaming/inclusion" as a part of that placement. The parents waived no right of their son to obtain the educational services identified in the IEP; they, and their son, are entitled to expect that the district would make more than token efforts to comply with the terms of the IEP. Nor was there evidence that the parents, "obligated to operate within the Act's procedural framework," *Cordrey*, 917 F.2d at 1466, failed to do so. That they were forceful, even difficult negotiators, yes; that they prevented their child from being mainstreamed or prevented the school district from taking steps to provide a mainstreamed education, no. [FN26]

> FN26. The Court is obliged to point out, however, that the Goldmans, on several occasions, complicated matters for the school district, themselves, and their son by assuming negotiating positions, which appear, at least to this Court, counter-productive. After the school

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

district's personnel agreed to investigate the matters addressed by the parents in the December, 1991, meeting to revise the Brantwood IEP, the parents canceled the continuation of that meeting, thereby giving the impression they were uninterested in hearing the results of the teachers' investigations about mainstreaming for their son. Likewise, after their experts and the school district staff and experts appeared to have agreed on an IEP for Michael for the 1992-93 school year, the Goldmans repudiated the tentative agreement, which, as a practical matter, combined elements of the Brantwood and Montessori placements. The repudiation of the agreement gives an impression that the Goldmans are reluctant to make compromises with the school district. The Goldmans' recalcitrance in relation to the school district is striking, given their understanding of the requests of the staff of the Montessori program to reduce the hours of their son's schooling on two separate occasions. Additionally, the parents' refusal to consider an IEP for speech and occupational therapy from the school district, while their son was enrolled at Montessori, Doc. # 46 at 184, is rationally inexplicable. The parents might be well advised to consider a modification in the negotiating techniques they have relied on thus far, especially since at least on two occasions they have been close to agreements with the school district which, in all likelihood, would have forestalled this litigation. The parents are, of course, in no way responsible for the school district's refusal to provide the services set forth in Michael's IEP at Brantwood. The parents, additionally, are to be honored for their willingness to fight for what they determine are their son's needs; the Court merely points to possible modifications in their negotiating techniques which may better serve their ultimate ends.

The responsibility of a school district is not over when it enters into an IEP negotiated pursuant to the terms of the **IDEA**; it has a continuing responsibility to make certain that all provisions of

that IEP are carried through and implemented in order for the child in question to receive the full benefit of that to which he is entitled under the Act. This, the school district failed to do for Michael Goldman.

**\*26** For the reasons stated above, the Court determines that Michael Goldman's placement in Brantwood during the 1991-92 academic year was not the least restrictive setting consistent with his needs and that the school district violated the **IDEA** by not providing him, to the maximum extent appropriate, an education with children who are not handicapped. As the administrative record and trial testimony and exhibits showed, by a preponderance of the evidence, that Michael did not receive the mainstreaming opportunities required by statute, the Court, therefore, affirms the SLRO's implicit ruling that the Brantwood placement was not the least restrictive setting consistent with Michael's needs.

B.    Reimbursement    for    the    Placement    at Montessori, 1992-93

The Goldmans have urged this Court to affirm the order of the SLRO requiring the school district to reimburse them for the cost of educating Michael in a private school until the district complied with the SLRO's order. As a practical matter, the order applies to the Goldmans' expenses incurred in educating Michael in the Montessori program during the 1992-93 academic year. The Goldmans also seek reimbursement for the fees charged by their expert, Ms. MacMillan, for the training sessions on autism she conducted for the Montessori staff, and for the fees she charged for speech therapy for Michael during the 1992-93 academic year. Doc. # 20 at 18. For the reasons stated below, the Goldmans are not entitled to reimbursement for tuition expenses at Montessori and the fees charged by their expert.

In *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 372-74 (1985), the Supreme Court established a two part test for determining whether reimbursement for non-public school tuition is appropriate under the **IDEA**. To obtain reimbursement for the cost of education in a private school, the parents must show *both* that the IEP proposed by the school district was *in* appropriate and that the actual placement *was* appropriate. *Id.* The **Sixth Circuit** emphasized that "removal of the disabled child to a private school at public expense

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

is only contemplated under the Act when the public school is unable to provide the child with an appropriate education and the private school is able to do so." *Gillette v. Fairland,* 932 F.2d at 554. While not providing a definition of an "appropriate education" in a private school setting, the *Gillette* Court evaluated the appropriateness of the child's private school education in accord with the two substantive guarantees of the **IDEA**--whether the child was obtaining educational benefits and whether the child was mainstreamed to the maximum extent appropriate. *Id.*

The Court now denies the Goldmans' request for reimbursement for tuition and related expenses for Michael's education at Montessori, finding that the school district's proposed placement was appropriate and that the education at Montessori, while in a mainstreamed environment, offered Michael no more than *de minimis* educational benefits and, therefore, was *in* appropriate. Reimbursement is, therefore, barred under *Burlington* and *Gillette.*

**\*27** The Centerville school district's proposed IEP for Michael Goldman for the 1992-93 academic year would have offered him educational benefits with significant opportunities for interaction with non-disabled children. While no formal IEP was produced, the evidence established that at the June 29, 1992, meeting, the school district proposed a half-day placement in CKV's regular kindergarten program, and a half-day placement in a special education resource room, with speech and occupational therapy provided as appropriate. When the school district mainstreams a disabled student, it typically assigns that student, with one or two others, into either of two classrooms. Each classroom is staffed with a regular education teacher and a special education teacher or aide alternates between the two classrooms. As each of the four disabled children who was so mainstreamed during the 1992-93 academic year made educational progress as defined by his or her IEP, the Court finds it is likely that Michael would also have made educational progress during that year.

The special education staff in CKV who would have worked with Michael during the afternoon were well qualified to teach disabled children, especially autistic children. The special education teacher, Ms. Moore, had ten years experience in special education and had previously worked as an

educational aide in a program for autistic children, and, for two summers, in a camp for autistic children. The four educational aides who could have worked with Michael during the 1992-93 year each were qualified to work with disabled children; two of these aides had previous experience working with autistic children. While it may be argued that this is not the best of all possible worlds, the **IDEA** does not impose that requirement. The school district's proposed program for Michael Goldman would have offered educational benefits with significant opportunities for mainstreaming. The proposed IEP would have provided him an appropriate education; the Goldmans' request for reimbursement, therefore, fails the first prong of the *Burlington/Gillette* test--that the proposed IEP/placement be *in* appropriate and, accordingly, the request for reimbursement must be denied on that basis alone.

The evidence also showed that the actual education provided in the Montessori program, chosen by the parents, *was in* appropriate and that the request for reimbursement violates the second prong of the *Burlington/Gillette* test--that the education in the private school be appropriate.

The evidence showed that Michael deteriorated in significant ways while at Montessori. [FN27] There is no dispute that he was unable to tolerate the mainstreamed setting for a full day by December, 1992. The evidence showed that Michael became too agitated to function in a group setting during the afternoons. This inability to tolerate a full day shows a significant deterioration in his ability to tolerate stimuli from complex environments. Moreover, this change represents a deterioration both from the initial months of his year at Montessori, and from his placement in Brantwood, when he was able to attend a full day of school, albeit in a segregated setting. The evidence also showed that even after Michael was attending Montessori for the morning session, from 8:00 a.m. to 11:15 a.m., he was ill at ease waiting to be picked up at the proper time and his teachers requested that he be picked up earlier, at 11:00 a.m. The fact that Michael did not bring his Canon communcation device to Montessori confirms that one method of communication with which he is comfortable was not utilized to stimulate his academic development throughout the entire year. Finally, the evidence showed that Michael became prompt-dependent and less willing to work with other children during the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1993 WL 1318610
(Cite as: 1993 WL 1318610 (S.D.Ohio))

course of the year. These changes in his ability to feel comfortable with complex, social intercourse, to act independently, and to function in groups, indicate he was not benefiting from his education.

> FN27. The Court points out that the evidence it relied upon in concluding that Michael regressed in major areas, remained static in many areas, and improved in limited areas was furnished by parties disinterested in the outcome of this litigation--his teachers at Montessori. The evidence offered by the teachers was noteworthy because of its lack of "puffing;" the teachers did not make claims about Michael's progress with them which would indicate they are especially gifted or effective teachers. The Court, as a consequence of the two teachers' relative disinterest in this litigation, and their striking lack of "puffing," found their observations especially persuasive.

The expert testimony offered by each side was of limited utility. Dr. Rubin, while generally a convincing witness, observed Michael only once during his year at Montessori, for three hours in May of 1993. While she was able to compare his classroom behavior to that she observed at Brantwood, more than a year previously, she could also have observed Michael on a bad day, which all of us, disabled or not, do have. Dr. Rubin is also a consultant to the school district and had previously recommended against a full-day placement in a mainstreamed setting, so she, arguably, has an interest in finding the Montessori program less than optimal. Her testimony was helpful, but not decisive.

Ms. MacMillan visited the school more frequently than did Dr. Rubin, but was also was working with Michael throughout the year. She had also been recommending a mainstreamed environment to the Goldmans for many months. Hence she, arguably, had a doubly vested interest in seeing progress, both as a dedicated teacher, working with Michael, and as a forceful advocate, assisting the Goldmans in their effort to assist their son in every way they deemed proper.

**\*28** His academic abilities remained constant or deteriorated; only a minority of abilities showed improvement, as measured by his teachers. While Michael enjoyed the mainstreamed setting and was popular with his fellow students, these pleasures, important though they be, cannot replace the requirement that an "appropriate education" permit "educational progress." *Diamond*, 808 F.2d at 991.

Given the conclusion that the education at Montessori was *in* appropriate, there is no basis for the Goldmans to receive reimbursement for their payments to Ms. MacMillan's employer for her training sessions with the Montessori staff about autism and Michael's needs. Finally, there is no basis for the Goldmans to receive reimbursement from the school district for their payments for speech therapy provided by Ms. MacMillan for Michael during the 1992-93 school year. There was no evidence which would show that the Goldmans' refusal of the school district's offer of an IEP, for speech and occupational therapy during the 1992-93 year, was a reasonable refusal. The Goldmans did not develop evidence showing that the school district's IEP was *in* appropriate. Consequently, the Goldmans are barred from recovering these funds under the first prong of the *Burlington/Gillette* test--that the proposed IEP/placement be *in* appropriate.

There was much evidence at trial about facilitated communication, a technique used by some educators working with autistic individuals. Facilitated communication, according to its proponents, is an "accommodation for the motor disturbances of autism." Doc. # 46 at 28. It permits persons with autism to overcome autism's barriers to communication, especially spoken communication, through a facilitator's offering physical support to an individual's hand or arm as that person attempts to communicate through alternate means, especially a keyboard, and through the facilitator's gentle halting of the autistic individual's frequent tendency to repeat a letter or a word. *Id.* Some of the testimony about this technique was introduced, presumably, to show that Ms. MacMillan's work with Michael during the year constituted appropriate therapy and, therefore, the Goldmans could or should be reimbursed for same. As the Court has concluded that the Goldmans have not shown that the school district's proposed IEP was *in* appropriate, there is no need to reach the issue of whether Ms. MacMillan's work with

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Michael is appropriate as a matter of law. Nor is there any reason to make a determination about whether facilitated communication is an empirically verified method for autistic individuals in general, or for Michael in particular. Assuming, *arguendo,* that Michael is one of the very few individuals who is able to communicate his own thoughts through facilitated communication, that fact does not change the Court's core conclusions--that the placement in Brantwood was not in the least restrictive setting consistent with his needs and that the Montessori program was not an appropriate educational placement. There is no need, consequently, to determine the utility of facilitated communication, in general, or Michael's ability, in particular, to use it.

*29 Based on the administrative record and trial testimony and exhibits, for the reasons stated above, the Court determines, by a preponderance of the evidence, that the placement offered by the school district for Michael in CKV for the academic year 1992-93, would have provided him with an appropriate education and that the education actually provided by the Goldmans during that year, in Montessori, was not appropriate. The SLRO's order for reimbursement of such expenses was inconsistent with the Supreme Court's analysis in *Burlington, supra,* which established a two-part test for reimbursement, namely, a showing both that the placement offered by the public school was *in*appropriate and the education provided by the private institution was appropriate. The Court, therefore, reverses the decision of the SLRO ordering reimbursement for the tuition, payments and fees involved in educating Michael in a private school during the 1992-93 academic year.

C. The Rehabilitation Act of 1973

The Goldmans have not established the elements of a prima facie case, let alone proved their case on the merits, that the school district violated Michael's rights under Section 504 of the Rehabilitation Act of 1973 by failing to educate Michael in the least restrictive setting appropriate to his needs. While Michael is a handicapped person and "otherwise [eligible]" for the reverse mainstreaming/inclusion listed in his IEP, and while the school district receives financial assistance, the Goldmans failed to demonstrate at trial that Michael was excluded from the position "solely by reason of his handicap." While there was little evidence introduced by either

side which indicated why Michael was not offered any more than *de minimis* reverse mainstreaming/inclusion opportunities, there was *no* evidence introduced which showed "discriminatory intent," *Pesterfield,* 941 F.2d at 441, on the part of the school district in denying Michael such opportunities. The evidence, rather, showed that the school district *did* provide other children with disabilities at Brantwood the reverse mainstreaming/inclusion opportunities that Michael's IEP indicated would be provided to him. The record is largely silent about why Michael did not receive like opportunities. Given the silence in the record, and the Goldmans' unmet obligation to set forth the prima facie case, the Court concludes that Michael's placement in Brantwood during the 1991-92 academic year did not violate Section 504 of the Rehabilitation Act of 1973.

D. Attorneys' Fees

The **IDEA** permits the court, "in its discretion, [to] award attorneys' fees as part of the costs to the parent or guardian of a handicapped child or youth who is the prevailing party." 20 U.S.C. § 1415(4)(B) . The Goldmans, though they were most difficult negotiators, did not "unreasonably protract[ ] the final resolution of the controversy," *Id.* at § 1415(4)(F)(i), and therefore are entitled to apply for attorney's fees for those claims upon which they prevailed at trial. The Goldmans are entitled to apply for attorneys' fees for their claim that the placement at Brantwood violated the **IDEA**; the Goldmans are not entitled to attorneys' fees for their claim that the placement at Brantwood violated the Rehabilitation Act of 1973 and for their claim for reimbursement of the tuition, costs, and fees of educating Michael at a private school during the 1992-93 academic year. *Hensley v. Eckerhart,* 461 U.S. 424, 440 (1983).

*30 For the reasons stated above, the Court hereby orders the Clerk of the Court, by separate document, to enter judgment in favor of the Defendant, Board of Education of the State of Ohio and against Plaintiff's claim that the decision of the state level review officer was contrary to law, contrary to evidence of record and otherwise improper. The Court further orders the Clerk of the Court, by separate document, to enter judgment in favor of the Defendants, Alan and Rebecca Goldman, and against Plaintiff, Board of Education of the Centerville School District, on the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

claim that Michael Goldman's placement in Brantwood Elementary School during the 1991-92 academic year violated the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* The Court further orders the Clerk of the Court, by separate document, to enter judgment in favor of the Plaintiff, the Board of Education of the Centerville City School District, and against the Defendants, Alan and Rebecca Goldman, on: the counterclaim seeking to have Plaintiff reimburse Alan and Rebecca Goldman for the costs of educating Michael Goldman in a private school during the 1992-93 academic year, as well as for the costs of the autism training and speech therapy provided by Ms. MacMillan; and on the counterclaim that placement in Brantwood during the 1991-92 academic year violated Section 504 of the Rehabilitation Act of 1973. The Court orders the Goldmans to submit a petition for attorneys' fees for the successful prosecution of their claim that the Brantwood placement violated the **IDEA.**

This matter is hereby order terminated upon the docket of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

1993 WL 1318610, 1993 WL 1318610 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works